**SHAWNEE TELECOM RESOURCES, INC., Successor by Merger to Shawnee Technology, Inc., Appellant,**

v.

**Kathy BROWN, Appellee.**

**No. 2009–SC–000574–DG.**

Supreme Court of Kentucky.

Oct. 27, 2011.

---

544

Derise Duane Cook, Georgetown, KY, Counsel for Appellant.

Clark Philip Case, Case & Case, LLP, Jessica K. Case, Getty & Childers, PLLC, Lexington, KY, Counsel for Appellee.

Janet Jakubowicz, Brent Robert Baughman, Greenbaum, Doll & McDonald, Louisville, KY, Counsel for Amicus Curiae, The Kentucky Chamber of Commerce.

Opinion of the Court by Justice ABRAMSON.

Subtitle 13 of the Kentucky Business Corporation Act, Kentucky Revised Statutes (KRS) Chapter 271B, gives shareholders the right to dissent from certain significant corporate actions and to obtain "fair value" from the corporation for their shares. This Court has never addressed "fair value" in a dissenters' rights action, leaving that issue to be governed for many years by the Court of Appeals decision in *Ford v. Courier–Journal Job Printing Co.,* 639 S.W.2d 553 (Ky.App.1982), a dissenters' rights action under a predecessor statute. Recently, in *Brooks v. Brooks Furniture Mfgrs., Inc.,* 325 S.W.3d 904 (Ky.App.2010), the Court of Appeals, *en banc,* explicitly overruled *Ford,* in part, rejecting the use of a marketability discount in assessing the fair value of a dissenter's stock in a closely held corporation except in exceptional circumstances. The case before us presents squarely the broad issue of "fair value" and the more specific issues of the continuing viability of a marketability discount in a dissenters' rights appraisal action and the appropriateness of valuing closely held corporate stock under the net asset method. Having thoroughly considered the statute and its underlying purpose, we conclude that "fair value" is the shareholder's proportionate interest in the value of the company as a whole and as a going concern. Any valuation method generally recognized in the business appraisal field, including the net asset and capitalization of earnings methods employed in this case, can be appropriate in valuing a given business and thus the Court of Appeals erred in categorically rejecting the net asset method. As for applying a marketability discount when valuing the dissenter's shares, we join the majority of jurisdictions which, as a matter of law, reject this shareholder-level discount because it is premised on fair *market* value principles which overlook the primary purpose of the dissenters' appraisal right—the right to receive the value of their stock in the company as a going concern, not its value in a hypothetical sale to a corporate outsider. However, generally recognized entity-level discounts, where justified by the evidence are appropriate because these are factors that affect the intrinsic value of the corporate entity as a whole. Although our reasoning is not entirely in accord with that of the Court of Appeals in this case, we agree that the fair value standard applied in this case was erroneous and that the matter must be remanded for reconsideration under the proper standard.

## RELEVANT FACTS

In December 2003, Shawnee Technology, Inc. (Shawnee Tech), a Kentucky cor-

poration headquartered and doing business in Lexington, merged into Appellant Shawnee Telecom Resources, Inc. (Shawnee Tel),[1] also a Kentucky corporation. The merger plan provided that one of Shawnee Tech's shareholders, Appellee Kathy Brown, would receive cash for her shares instead of shares in the new company, a so-called cash-out merger authorized by KRS 271B.11–010. The announcement of the merger triggered Brown's rights under KRS 271B.13–020, and she duly demanded from Shawnee Tech what she asserted was "fair value" for her shares. Disputing the amount of Brown's entitlement, Shawnee Tech, pursuant to KRS 271B.13–300, brought the present action in the Fayette Circuit Court for an appraisal of Brown's interest in the company. To understand fully the events that led to the cash-out merger and judicial appraisal litigation, it is necessary to step back a few years.

Shawnee Tech was the successor of Shawnee Installation Services, LLC, a company organized in June 1998 by Jim Clark, Brown, Andrea Simmons, and Gina Thomas. The company incorporated as Shawnee Tech, a Subchapter S corporation, in 1999. Ownership was divided 49% to Clark, 24% each to Brown and Simmons, and 3% to Thomas. According to Shawnee, the foursome hoped to build on Clark's experience installing communications devices and his contacts with telecommunications companies, by providing a sort of employment agency for the local telecommunications industry. Telecommunication companies, including MCI and Quest, which installed switches and other devices necessary for the provision of such services as dial-up internet access would engage Shawnee to provide temporary installation workers. Clark provided tech-

nological expertise, while Brown and Simmons, it appears, attempted to recruit both customers and installation workers and also to coordinate the assembling of installation crews in response to installation requests.

One of Shawnee's principal customers was a local branch of the global engineering and consulting company Siemens, Inc. For several years, Siemens had employed Clark, and his company Shawnee Communications, Inc., to provide installation services to its customers. Over the years, Clark developed a close working relationship with a couple of Siemens's managers. Until January 2000, apparently, Clark made some effort to divide the work for Siemens between Shawnee Communications and Shawnee Tech, but at that time he allowed Shawnee Communications to be subsumed by the newer company.

Shawnee Tech's early years coincided with a boom in the telecommunications industry, and the company fared well. Its adjusted operating income in 1999 was in excess of $650,000, and in 2000 in excess of $2,000,000. The industry suffered a sharp retraction in 2001, however, and several of Shawnee Tech's customers ceased to expand or went out of business altogether. The company operated at a loss that year, but managed to survive in large part due to Siemens, which became for a time virtually Shawnee's only customer. In 2002 and 2003, Shawnee again profited, generating adjusted operating income in excess of $500,000 and $750,000, respectively, but Siemens remained by far the dominant source of that income.

In the summer of 2001, Brown informed her colleagues that she wished to withdraw from the company in order to return to

---

1. When the distinction between its different manifestations is not important, we shall refer

to the company simply as "Shawnee."

school. Withdrawal from the company was apparently provided for by a buy-sell provision of Shawnee Tech's Shareholders Agreement, and it appears that initially Brown's withdrawal did not raise any objection. The company ceased to pay her as an employee in October of that year, but she remained a shareholder and agreed to defer payment for her shares until the company had adjusted to her departure and could make the payment without unduly disrupting its operations. Acrimony developed, however, as the parties could not agree upon a buy-out price, and a dispute arose over the meaning of the buy-sell provision. Rather than pursuing that dispute, however, Shawnee Tech opted instead to extinguish Brown's shares via the cash-out merger into Shawnee Tel, and pursuant to the merger tendered to Brown $168,840.00 or about $703.50 per share. Claiming that the fair value of her shares was $2190.00 per share, Brown demanded an additional $356,000.00, whereupon Shawnee sought appraisal by the Fayette Circuit Court.

Shawnee filed its complaint on December 9, 2003, and completed the merger on December 31. That date became, therefore, the date as of which Shawnee Tech was to be appraised. The trial court referred the appraisal to the Master Commissioner, who heard evidence over several days in late May and June of 2006 and rendered his report on about June 5. In the meantime, the contentious litigation did nothing to ease the parties' hard feelings. In April 2005, Brown filed a counterclaim, alleging, among other things, that Shawnee and/or its directors had improperly withheld and deprived her of dividends during the whole of 2003. Clark, who was named by Brown as a counterclaim defendant, and Shawnee then responded with claims against Brown alleging, for the first time, that Brown's withdrawal from the enterprise breached a contract with Clark and that her lackadaisical job performance throughout her tenure with the company breached her contractual obligations as an employee and her fiduciary obligations as a director. The trial court severed these collateral matters from the appraisal proceeding and referred to the Commissioner the appraisal alone.

Before the Commissioner, both parties presented expert testimony concerning the value of the business as of December 31, 2003, and the value of Brown's shares. James Roller, an accountant with the firm of Hisle & Company and a certified business appraiser, testified for Shawnee. He noted that standard techniques of business evaluation include market-based approaches, approaches based on the company's assets, and approaches based on the company's income. Because he had been unable to find information regarding actual sales of companies comparable to Shawnee, he did not employ any market-based techniques.

As an assets-based approach, Mr. Roller employed a simplified version of the adjusted net assets method. He analyzed Shawnee's books and attempted to establish from them the market value of the company's assets, primarily cash, and its liabilities. He then deducted the latter from the former and adjusted that net amount for what he claimed would be the effect of income taxes. He arrived at an after tax value of $1,249,600. He noted, however, that a major limitation of this simplified approach was its inability to identify and value intangible assets, which his analysis made no attempt to do.

Mr. Roller employed the capitalization of earnings method as his income-based approach. For each of the five years up to and including 2003, he determined the company's net income and normalized that

amount by removing all income not derived from operations. He also removed the officers' compensation. He thus arrived at an adjusted operating income for each year. He then calculated a weighted average of those incomes, the weight decreasing with each year farther from the most recent. This figure, $689,500.00, he discounted at the corporate tax rate for what he again claimed would be the effect of income tax. The after-tax estimated income, $413,700, he then capitalized at a rate he built up beginning with the rates of standard competing investments and then adding factors for the company's small size and for risks specific to this company, such as its uncertain industry and its heavy dependence on a single customer, Siemens, and on a single officer, Clark, who was the sole reason for Siemens's patronage. Apparently assuming that Shawnee's income would hold steady but would not grow, he arrived at a capitalization rate of 32%, which, applied to his after tax income estimate, yielded a value for the company of $1,292,812.

Because the capitalization of earnings method would capture the company's intangibles, Mr. Roller believed it was preferable in this case to the net assets method. To arrive at the value of Brown's shares, Mr. Roller next discounted his estimate of the company's total value by 25% to account for the fact that shares of a closely held corporation do not enjoy a ready market and so, other things being equal, would sell for less than the more easily traded shares of a public company. The propriety of this so called marketability discount is one of the main issues before us. Thus discounted, the total value of the company's shares, according to Mr. Roller, was $969,750, and the value of Brown's 24% interest was $232,740.

Brown's expert, Mr. Marc Ray, an accountant with the firm of Ray, Foley, Hensley & Company, PLLC, and also, like Mr. Roller, a certified business appraiser, did not take issue with Mr. Roller's general approach. He agreed with Mr. Roller that a lack of comparable companies precluded any market-based estimates of Shawnee's value, and he agreed that the capitalization of earnings method was superior in this case to the net asset method. He did take issue, however, with Mr. Roller's application of the capitalization approach. In particular, he asserted that Mr. Roller had normalized Shawnee's net income too aggressively and that a fairer estimate of Shawnee's average adjusted net income was $737,337. He also maintained that neither an income tax nor a marketability discount should apply. The tax discount was not appropriate for an S corporation, he asserted, since the corporation itself pays no income tax, and in this context a marketability discount was inappropriate, since the value being sought was not the market value of Brown's shares, but rather her proportionate interest in the company's total value as a going concern. Adjusting Mr. Roller's calculations accordingly, Mr. Ray arrived at a value for Brown's interest of at least $576,232.

The Commissioner was not entirely satisfied with either expert's analysis. He was especially concerned that neither of them had adequately accounted for Shawnee's near total dependence on Clark's relationship with Siemens. Both experts had added 15% to the capitalization rate for the company's specific risk factors, but as the Commissioner noted, neither of them could say why he chose that particular percentage. It was evidently the Commissioner's belief that the risk posed by Shawnee's reliance on a single customer and a single key manager should have resulted in a steeper capitalization rate. Accordingly, the Commissioner was unwilling to give the capitalization of earnings approach the weight accorded it by the

experts. Instead, the Commissioner, borrowing from both experts' analyses, found a capitalized earnings value of $2,304,178 and a net asset value of $1,343,860. He noted a dispute among experts concerning the propriety of an income tax adjustment when valuing an S corporation, and, declining to discount for taxes, ruled that Shawnee had failed to meet its burden of justifying that discount. The Commissioner did, however, discount the capitalized earnings value for lack of marketability. He acknowledged that the current version of the Model Business Corporations Act (MBCA) precludes marketability discounts, but relying on *Ford v. Courier–Journal Job Printing Co.*, in which the Court of Appeals approved a marketability discount, the Commissioner ruled that such discounts are allowed under Kentucky's version of the MBCA. The Commissioner then averaged the two values, giving the net asset value twice the weight of the capitalized earnings value, and arrived at a value for Brown's 24% interest of $353,633.

By Judgment entered November 14, 2007, the trial court adopted the Commissioner's report without change, and both parties appealed. Among other claims of error, Shawnee maintained, contrary to its own expert, that the Commissioner should have given no weight to the capitalized earnings approach, but should have valued the company solely on the basis of its net assets. Brown argued in her cross-appeal that the Commissioner erred by giving any weight to the net asset value and erred as well by applying a marketability discount to the capitalized earnings value. In an Opinion rendered August 14, 2009, a unanimous panel of the Court of Appeals agreed with Brown. In line with that Court's recent *en banc* decision in *Brooks v. Brooks Furniture Manufacturers, Inc.*, 325 S.W.3d at 904, the panel held that, generally, marketability discounts are in-

appropriate in fair-value proceedings under the dissenters' rights statute and should not have been applied in this case. Agreeing with Brown as well that in this case the net asset valuation amounted to an impermissible market value determination, the panel reversed the trial court's judgment and remanded for a determination of the fair value of Brown's shares without reference to the company's net asset value and without any discount for lack of marketability. We granted Shawnee's motion for discretionary review to consider the question of "fair value" under Subtitle 13 of our Business Corporation Act, a question of particular concern to the many Kentuckians who own shares in closely held corporations. For the reasons discussed below, we agree with the Court of Appeals that the trial court's judgment must be vacated and remanded.

### ANALYSIS

**I. The Appraisal Portion of the Trial Court's Judgment is Final and Appealable Pursuant to CR 54.02.**

**A. The Trial Court Did Not Abuse Its Discretion by Severing the Appraisal From the Parties' Other Claims.**

Before turning to the "fair value" question, we first address Shawnee's claim that this appeal arises from a non-final judgment and so is not properly before us. As noted above, on April 1, 2005, Brown filed a counterclaim alleging that Shawnee Tech's other shareholder/directors—Clark, Simmons, and Thomas—had wrongfully exercised their control of the company by withholding dividends during the whole of 2003, with the intent of depriving her of her proportionate share of them. On June 29, 2005, Shawnee and Clark then responded with their own claims alleging that Brown had breached her employment and fiduciary duties to Shawnee by failing to

use her best efforts on behalf of the company, and had breached an alleged agreement with Clark, under which, in exchange for Clark's transferring his company, Shawnee Communications, Inc., to Shawnee Tech, Brown and Simmons were to buy out Clark's interest in Shawnee Tech within five years so that Clark could retire. The trial court deemed these counterclaims collateral to the main, statutory question of the fair value of Shawnee stock, and so severed them from the valuation, which it referred to the Commissioner. When the court subsequently adopted the Commissioner's report and entered judgment on the valuation claim, the court had dismissed Clark's claim, but otherwise the counterclaims remained pending. The trial court nevertheless rendered the valuation judgment final and appealable by incorporating the finality language provided for in Kentucky Rule of Civil Procedure (CR) 54.02.

■ That rule, of course, in cases such as this one involving multiple claims, allows a trial court to grant a final judgment as to fewer than all the claims, and hence to make possible an immediate appeal, upon a determination that there is no just reason for delay. *Watson v. Best Financial Services, Inc.*, 245 S.W.3d 722 (Ky. 2008). That determination should be sensitive to the general rule disallowing piecemeal appeals, but the trial court is granted discretion in applying the rule. Where the judgment truly disposes of a distinct and separable aspect of the litigation, the trial court's determination that there is no just reason for delay will only be disturbed if that discretion was abused. *Id.* at 725–27.

Shawnee maintains that the valuation should not be deemed final, because the value of Shawnee Tech hinges materially on the outcome of Clark's counterclaim against Brown. The gist of the argument is that in 2000, when Clark transferred Shawnee Communication to Shawnee Tech, he was intending to retire and relied on Brown's and Simmon's promises to remain in the business and to take it over from him within five years. Brown's withdrawal from the company in 2001 is alleged to have breached that agreement or to have frustrated Clark's justifiable expectations, with the result that Clark should now be allowed somehow to reconstitute the dissolved Shawnee Communications and reclaim its business from Shawnee Tech. Since Shawnee Communications did the lion's share of the business with Siemens, the argument runs, its removal from Shawnee Tech would render that company, and Brown's share of it, essentially valueless. Hence, according to Shawnee, the valuation should not be deemed final until Clark's counterclaim has been finally decided.

The trial court rejected this argument, implicitly ruling that the counterclaims, all of which involve factual allegations and legal theories having nothing to do with the sort of business and financial questions addressed to the Commissioner, could be decided separately and remedied, should remedies be called for, monetarily. This ruling, while not mandatory, was certainly legally appropriate and within the trial court's discretion. It is difficult to see, and Shawnee has offered no reason, why Clark would be entitled to a restitutionary remedy against Shawnee Tech, the company, for an alleged breach by Brown, individually. This is especially so when, as Clark's claim recognizes, should Brown be found liable, she could be ordered to pay Clark monetary damages or to return to Clark, not a company, which was not hers to return, but the amount by which she had been unjustly enriched. In the final analysis, Shawnee seems to suggest that any potential judgment Clark may personally obtain against Brown should be se-

cured by delaying the appraisal remedy and resulting payout, a pre-judgment attachment of sorts for which there is no authority. Shawnee's breach of fiduciary duty and other claims against Brown, even more clearly, can be resolved without affecting the valuation of Shawnee Tech. The trial court did not err, in other words, by rejecting Shawnee's attempt to entangle the valuation claim with the claims against Brown and by ruling that the valuation judgment finally determined a statutory claim distinct and severable from the others.

Nor did the court abuse its discretion when it determined that there was no just reason to delay appeal of the valuation judgment. When that judgment was entered the case was already nearly four years old. Rather than subject a judgment on the main issue to additional delay occasioned by collateral issues of dubious merit and of no bearing on the valuation, the trial court could reasonably allow the principal appeal to proceed. In short, CR 54.02 was properly invoked and this case was properly before the Court of Appeals and is now properly before this Court.

**B. The Trial Judge Was Not Obligated to Recuse and Thus His Post–Judgment Rulings Were Valid Notwithstanding His Later Decision to Recuse.**

■ Shawnee maintains the valuation judgment also cannot yet be deemed final because the post-judgment rulings were made by a trial judge who should have recused. As noted, that judgment was entered on November 14, 2007. On November 15, Shawnee filed a motion objecting to the court's finality determination. On November 24, Shawnee filed a motion pursuant to CR 59 and CR 62.04 seeking reconsideration of both the Judgment and finality. Then, on December 10, Shawnee filed a motion demanding that the trial judge recuse himself. This latter motion was premised on a remark the trial judge, Judge Payne, had made at the conclusion of an October 24, 2007 hearing to consider Brown's motion for attorneys' fees and costs. Granting that motion, Judge Payne wryly remarked that the case was apt to be referred to the regular Third Division judge because, "I am sure I will be accused of being prejudiced." Shawnee pounced on the remark as itself creating the appearance of bias, and for that reason moved Judge Payne to recuse. By Order entered December 17, 2007, Judge Payne denied Shawnee's motions for reconsideration of the Judgment and its finality, but agreed thenceforth to withdraw from the case. Shawnee maintains that the December 17 Order is inconsistent: If recusal was appropriate, then it was not appropriate for Judge Payne to rule on Shawnee's other pending motions. Thus, Shawnee asserts, the appeal should be dismissed and the matter remanded for proper disposition of its post-judgment motions by another judge.

Were the hypothesis of Shawnee's conditional true, that is, had recusal truly been called for, we might agree with Shawnee that Judge Payne should have left the pending motions for his successor. We agree with the Court of Appeals, however, that Judge Payne's offhand remark, referring only to the fierce determination with which the case had been litigated on both sides, did not and could not reasonably be thought to create the appearance of bias against Shawnee. (*See* Kentucky Code of Judicial Conduct, Canon 3E "A judge shall disqualify himself or herself in a proceeding which the judge's impartiality might *reasonably be questioned* . . . ." (emphasis supplied). Shawnee itself admits that nothing else in the four years of this litigation or in the twelve volumes of its record suggests the least bias on Judge Payne's part, and we are not persuaded that his

mild ironic comment at the end of the October hearing does so either. Since Judge Payne need not have recused himself, his having subsequently chosen to do so in no way taints his order denying Shawnee's post-judgment motions and so does not undermine the finality of the valuation judgment. Convinced thus that the matter is properly before us, we turn to the heart of Shawnee's appeal.

## II. "Fair Value" Under the Dissenters' Rights Statutes Means the Dissenters' *Pro Rata* Share of the Company as a Going Concern.

■ Under our dissenters' rights statutes, a properly dissenting shareholder is entitled to the "fair value of [his or her] shares and accrued interest." KRS 271B.13–300. The only statutory attempt at illuminating the meaning of "fair value" appears in KRS 271B.13–010(3) which defines "fair value" as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Thus, the task before us is one of statutory construction—determining what our legislature meant by the "fair value" of a dissenter's shares. This is an issue of law which we address *de novo*. *Hearn v. Commonwealth*, 80 S.W.3d 432, 434 (Ky.2002) (citing *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth*, 983 S.W.2d 488 (Ky.1998)).

■ In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. *Osborne v. Commonwealth*, 185 S.W.3d 645 (Ky.2006).

We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes. *Hall v. Hospitality Resources, Inc.*, 276 S.W.3d 775 (Ky.2008); *Lewis v. Jackson Energy Cooperative Corporation*, 189 S.W.3d 87 (Ky.2005). We also presume that the General Assembly did not intend an absurd statute or an unconstitutional one. *Layne v. Newberg*, 841 S.W.2d 181 (Ky.1992). Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts. *MPM Financial Group, Inc. v. Morton*, 289 S.W.3d 193 (Ky.2009); *Knotts v. Zurich*, 197 S.W.3d 512 (Ky.2006); *Stephenson v. Woodward*, 182 S.W.3d 162 (Ky.2005).

The afore-cited definition of "fair value" in KRS 271B.13–010(3) is of limited use because it merely provides the time at which the value should be ascertained ("immediately before the effectuation of the corporate action to which the dissenter objects") and then dictates a disregard of any fluctuation in value attributable to that action unless to do so would be "inequitable." The plain language itself, "fair value", is not immediately instructive either because, as other courts have observed, it is "a term that does not have a commonly accepted meaning in ordinary usage, much less in the business community." *Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 359 (Colo.2003). Faced with an ambiguous term, we look to the dissenters' rights statute as a whole and its underlying purpose as well as the instructive precedent of other courts. Notably, in the course of that extensive examination, it becomes clear that the Court of Appeals decision in *Ford v. Courier–Journal Job*

*Printing Co.* does not accurately address "fair value" and should be overruled in its entirety. We begin by considering briefly the evolution of dissenters' rights statutes generally and the safeguard they provide against the majority's misuse of the freedom it generally enjoys to mold the corporate enterprise as it sees fit.

## A. The Appraisal Remedy Has Evolved to Serve Mainly an Anti–Oppression Purpose.

At common law,[2] prior to the advent of corporation statutes, unanimous shareholder consent was required to effect fundamental changes in the corporation. The minority's veto power enabled it to create a nuisance value for its shares, so to counteract such abuses the early corporation statutes provided that even fundamental changes could be effected by majority, rather than unanimous, vote. Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law,* 84 Geo. L.J. 1 (1995); Robert B. Thompson, *The Case For Iterative Statutory Reform: Appraisal And The Model Business Corporation Act,* 74–WTR Law & Contemp. Probs. 253 (2011). To compensate minority shareholders for the loss of their veto, every state adopted in some form a statute that gave them instead, in the event of a wide variety of fundamental corporate changes, a right to withdraw their investment for its value as determined by a judicial appraisal. *Id.* The purpose of the appraisal remedy was twofold. It was meant to provide a sort of liquidity for the shares of investors who found themselves trapped in an altered corporate investment of which they no longer approved, and it was meant to protect minority shareholders from majority overreaching. *Id.*

For the sake of the first purpose, the appraisal remedy was available to shareholders whose investments survived the corporate change intact, but who, because of the change, sought, in essence, to have their shares redeemed for a judicially determined amount. There remained a good deal of nuisance potential in those situations, which led for a time, until statutory reform made it less necessary, to the byzantine structuring of corporate mergers and like transactions to avoid triggering appraisal rights. *Id.* By and large, courts in those cases were sympathetic to the corporations, *id.,* and because of frustration with the appraisal remedy in those

2. There has been extensive commentary concerning the development of the appraisal remedy. In addition to the sources cited for particular points in the body of our discussion we have relied generally on the following articles: Henry F. Johnson and Paul Bartlett, Jr., *Is a Fistful of Dollars the Answer? A Critical Look at Dissenters' Rights Under the Revised Model Business Corporation Act,* 12 J.L. & Com. 211 (1993); James H. Eggart, *Replacing the Sword with a Scalpel: The Case for a Bright-line Rule Disallowing the Application of Lack of Marketability Discounts in Shareholder Oppression Cases,* 44 Ariz. L.Rev. 213 (2002); Bobbie J. Hollis II, *The Unfairness of Applying Lack of Marketability Discounts to Determine Fair Value in Dissenters' Rights Cases,* 25 J. Corp. L. 137 (1999); Douglas K. Moll, *Shareholder Oppression and "Fair–Value": Of Discounts, Dates, and Das-* *tardly Deeds in the Close Corporation,* 54 Duke L.J. 293 (2004); Charles W. Murdock, *Squeeze-outs, Freeze-outs, and Discounts: Why is Elinois in the Minority in Protecting Shareholder Interests?,* 35 Loy. U. Chi. L.J. 737 (2004); Charles W. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and its Impact Upon Valuation of Minority Shares,* 65 Notre Dame L.Rev. 425 (1990); Robert B. Thompson, *The Case for Iterative Statutory Reform: Appraisal and the Model Business Corporation Act,* 74–WTR Law & Contemp. Probs. 253 (2011); Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law,* 84 Geo. L.J. 1 (1995); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value,* 47 Duke L.J. 613 (1998).

situations, among other reasons, "the law moved more firmly in the direction that one who invests in a corporation has agreed to business decisions being made by the directors or majority shareholders, even for changes previously seen as fundamental." *Id.* at 255. The liquidity rationale for the appraisal remedy thus lost purchase, and legislatures gradually narrowed the circumstances in which it could be invoked. *Id.*

Even as the liquidity rationale diminished in significance, the appraisal remedy's other purpose—as a check upon majority oppression—has come into its own during the last twenty-plus years. The remedy is invoked for this purpose in circumstances quite unlike those that earlier were thought to justify a shareholder's withdrawal from the corporation. Indeed, the remedy is now invoked primarily in situations not where the minority shareholder wants out, but where he or she is being forced out. Under statutes such as KRS 271B.11–010 and KRS 271B.6–040, which authorize mergers and reverse stock splits the effect of which is to "cash out" a minority shareholder, a lack of liquidity is not the minority shareholder's concern. Of concern, rather, is the amount that shareholder will receive for an investment that is being usurped. The potential for abuse in such transactions is obvious, especially in cases in which the merger is not a transaction with a third party, but involves the majority's sale or transfer of the company to itself at a price of its own choosing. The majority clearly has a strong incentive to choose an artificially low price, since any loss it incurs as seller it recoups as buyer, whereas the loss imposed on the "cashed out" minority compelled to sell at an unfairly low price becomes a gain for the majority. Although protection against the conflict of interest inherent in such transactions has been a purpose of the appraisal remedy from its inception in the earliest corporation statutes, since at least 1989 and *Cavalier Oil Corporation v. Harnett,* 564 A.2d 1137 (Del.1989), that purpose has become the focus of the remedy, and the statutes creating the remedy have widely been construed to insure that the remedy is effective for that purpose.

Dissenters' rights statutes, as noted above, exist in some form in every state, and in the vast majority of the states protection is accorded by an appraisal remedy pursuant to which the dissenting shareholder is entitled to the "fair value" of his or her shares. As noted, under our statutes, "fair value" for dissenters' rights purposes is simply defined as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." KRS 271B.13–010(3). This definition and the dissenters' rights provisions to which it applies are part of the Kentucky Business Corporation Act. That Act is based on the Model Business Corporation Act, which was first promulgated by the American Bar Association in 1950. In 1988, the General Assembly repealed the then-existing Corporation Act and adopted the 1984 revision of the Model Act. That revision remains the primary basis of the Act in Kentucky, although the General Assembly has adopted certain provisions from subsequent Model Act revisions. As of 2010, thirty other states had adopted all or substantially all of the Model Act as their general corporation statute, *Model Business Corporation Act Annotated, Official Text and Official Comments* (2011), and fourteen others, although not "Model Act" states, use "fair value" as the standard for appraisal in dissenters' rights proceedings. *Pueblo Bancorporation,* 63 P.3d at 353 (surveying the other states).

As long as liquidity seemed the purpose of the appraisal remedy, courts often understood "fair value" to mean essentially fair market value and understood their task as identifying a sort of quasi-market price for the dissenting shareholder's particular shares. Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613 (1998). Since a block of shares that does not convey a controlling interest in the company would ordinarily sell for less than a block that did, in arriving at this hypothetical market price, courts sometimes applied a discount for lack of control, a so-called minority discount. Christopher Vaeth, Annotation, *Propriety of Applying Minority Discount to Value of Shares Purchased by Corporation or Its Shareholders From Minority Shareholders*, 13 A.L.R.5th 840 (1993). Similarly, since shares of a private corporation generally sell for less, other things being equal, than shares of a public company for which there is a ready market, when appraising shares of a private company courts sometimes applied a discount for lack of liquidity, a so-called marketability discount. Stephen A. Hess, J.D., *Use of Marketability Discount in Valuing Closely Held Corporation or Its Stock*, 16 A.L.R.6th 693 (2006). Because these discounts apply to share value, as opposed to the value of the company as a whole, they are referred to as shareholder-level discounts and are contrasted with so called entity-level discounts, discounts meant to account for factors that affect the value of the going concern, such as a company's reliance on one or a few key managers or dependence upon a limited customer or supplier base. Shannon P. Pratt, *Business Valuation Discounts and Premiums* 3 (2001).[3]

As the appraisal remedy came more clearly to focus on the anti-oppression as opposed to the liquidity purpose, courts increasingly construed "fair value" for that purpose not as the hypothetical price of the dissenting shareholder's shares, but rather as the shareholder's proportionate interest in the company as a going concern. Since the price of the particular dissenter's shares was not being estimated, the shareholder-level discounts used to arrive at that price came to be regarded as inapplicable. A leading case in this development was the 1989 Delaware case cited above, *Cavalier Oil Corporation v. Harnett*. In *Cavalier*, the Delaware Supreme Court had before it a cash-out merger very similar to the one in this case and a dispute over the "fair value" of the dissenting shareholder's minority interest. The "fairness concept," the Court explained, "implicate[s] two considerations: fair dealing and fair price." *Id.* at 1144. Since in that case there was no dispute over the fairness of the process, the trial court's task

> was to value what has been taken from the shareholder: viz. his proportionate interest in a going concern.... To this end the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations.... The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the Court of Chancery is not

---

3. Pratt identifies as additional examples of entity-level discounts a discount for "trapped-in capital gains", a discount for known or potential environmental liability, a discount for pending litigation and a discount for " 'portfolio,' 'conglomerate,' or 'nonhomoge-neous assets' " which apparently refers to "an unattractive assemblage of assets." *Business Valuation Discounts* at 4. As discussed below, the small size and privately-held nature of a business can justify a corporate level discount if properly documented.

required to apply further weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability.

*Id.* at 1144 (citations and internal quotation marks omitted). Shareholder level discounts are generally inappropriate, the Court continued, because

[t]he application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a *pro forma* sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Id.* at 1145.

In the wake of *Cavalier*, the vast majority of states to consider the appraisal remedy for ousted minority shareholders have likewise held that "fair value" in this context means the shareholder's proportionate interest in the company as a whole valued as a going concern according to accepted business practices. *Brown v. Arp and*

*Hammond Hardware Company,* 141 P.3d 673 (Wyo.2006) (collecting cases). Because an award of anything less than a fully proportionate share would have the effect of transferring a portion of the minority interest to the majority, and because it is the company being valued and not the minority shares themselves as a commodity, shareholder-level discounts for lack of control or lack of marketability have also widely been disallowed. *See e.g., In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d 997, 1005 (Me.1989) ("Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs."); *Arnaud v. Stockgrowers State Bank of Ashland, Kansas,* 268 Kan. 163, 992 P.2d 216, 220 (1999) ("To allow a discount under the facts of this case would discourage investments in corporations by persons who would acquire a minority interest because it would enable the majority shareholders to seize the minority shareholders' interest in the corporation to the extent a minority or marketability discount is allowed. Investments should be encouraged, not discouraged."); Charles W. Murdock, *Squeeze-outs, Freeze-outs, and Discounts: Why is Illinois in the Minority in Protecting Shareholder Interests?* 35 Loy. U. Chi. L.J. 737 (2004) (surveying the states and finding as of early 2003 thirty-one with appellate decisions rejecting minority discounts versus three accepting them and twenty with appellate decisions rejecting marketability discounts versus six accepting; further noting that of those six (the Kentucky Court of Appeals decision in *Ford* being one), only three were post-*Cavalier* and only one, *Stanton v. Republic Bank of S. Chi.,* 144 Ill.2d 472, 163 Ill.Dec. 524, 581

N.E.2d 678 (1991), was a state supreme court decision).[4]

Recognizing and endorsing the trend against such discounts, in 1994 the American Law Institute's Principles of Corporate Governance recommended that in dissenters' rights appraisal proceedings "fair value" should be the value of the shareholder's "proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability ... [F]air value should be determined using the customary valuation concepts and techniques generally employed in the relevant securities and financial markets for similar businesses in the context of the transaction giving rise to appraisal." Principles of Corporate Governance: Analysis and Recommendations § 7.22(a) (ALI 1994). In 1999 the American Bar Association's Committee on Corporate Laws, followed suit and revised the Model Business Corporation Act's definition of "fair value" to provide that value was to be determined "using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and ... without discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to section 13.02(a)(5)." *Model Business Corporation Act* § 13.01(4)(ii)(iii) (2006).

As of 2010, ten states had adopted the 1999 Model Act revision, Thompson, *The Case for Iterative Statutory Reform*, 74–WTR Law & Contemp. Probs. at 268, but even in states, like Kentucky, that continue to use the 1984 version of the Model Act, "fair value" has been construed as the dissenting shareholder's *pro rata* share of the company as a whole, without shareholder-level discounts for lack of control or lack of marketability. *Brown v. Arp and Hammond Hardware Company* (Wyoming); *Pueblo Bancorporation v. Lindoe, Inc.* (Colorado); *Ex parte Baron Services*, 874 So.2d 545 (Ala.2003); *Hogle v. Zinetics Medical, Inc.*, 63 P.3d 80 (Utah 2002); *First Western Bank Wall v. Olsen*, 621 N.W.2d 611 (S.D.2001). These Courts have found no legislative significance in the failure of their legislatures to adopt the 1999 revision; have emphasized the statute's use of "fair value" as distinct from "fair market value" as indicating an express rejection of a market value standard; and have endorsed the post-*Cavalier* view that if the appraisal remedy is to be effective, as the legislature must have intended, then shareholder-level discounts should not be applied.

**B. "Fair Value" Under the Majority Position Now Adopted Precludes Any Shareholder–Level Discount of Brown's Shares.**

Against this background of the appraisal remedy's evolution elsewhere in the country, we may turn to our own dissenters' rights statute and to Shawnee's urging that we construe it in accord with the Court of Appeals' construction of its predecessor statute in *Ford v. Courier–Journal Job Printing Company*, 639 S.W.2d at 553. *Ford* involved not a cash-out merger as in this case, but a sale of a printing company to a third party. A majority of the printing company's shareholders voted to approve the sale, and that vote triggered the appraisal rights of two minority shareholders who had opposed it. The dissenters' rights statutes in effect in Kentucky at that time, parts of a prior version of the

---

4. Since then the Supreme Courts of Alabama and Wyoming have endorsed the majority view. *Ex parte Baron Services*, 874 So.2d 545 (Ala.2003); *Brown v. Arp and Hammond Hardware Company*, 141 P.3d at 673.

Model Business Corporation Act, provided, as does the 1984 version of the Model Act now in effect, that the dissenting shareholders were entitled to the "fair value" of their shares. The statutes defined "fair value" only as the value of the dissenters' shares as of the day prior to the triggering vote. No Kentucky case had addressed the question, so in construing the dissenters' remedy, the Court of Appeals looked to other states with similar statutes. At that time the appraisal technique long practiced by the Delaware courts, the so-called "Delaware block" method had been widely adopted by other states. It was that technique, as employed by the Supreme Court of Maine in the case of *In re Valuation of Common Stock of Libby*, 406 A.2d 54 (Me.1979), that the Court of Appeals relied upon in *Ford.*

Under the Delaware block method, the appraising court was to consider three approaches to the appraisal: the market value approach; the earnings or investment approach; and the net asset approach. Depending on the facts of the particular case, the court was then to assign a weight to the different approaches, and their weighted average was the result. In *Ford,* the Court of Appeals held that this weighted average method was appropriate under our statute and that the trial court's appraisal had adequately conformed to it. The Court also held, without any citation to authority, that the trial court had not abused its discretion by reducing the weighted average value by 25% to reflect the fact that shares in a private company are not readily marketable.

The ink on *Ford* was barely dry when the Supreme Court of Delaware revisited its approach to dissenters' rights appraisals and abandoned the strict block method. In *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), the Court took up the question

of "fair value" for a dissenter's stock and noted that in the trial court

> the so-called "Delaware block" or weighted average method was employed wherein the elements of value, *i.e.,* assets, market price, earnings, etc., were assigned a particular weight and the resulting amounts added to determine the value per share. This procedure has been in use for decades.... However, to the extent it excludes other generally accepted techniques used in the financial community and the courts, it is now clearly outmoded. It is time we recognize this in appraisal and other stock valuation proceedings and bring our law current on the subject.... The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value.

457 A.2d at 712–13. As quoted above, it was this language from *Weinberger* that the Delaware Supreme Court expanded upon six years later in *Cavalier* when it held that in an appraisal action the company's value as an operating entity was first to be determined and only then the shareholder's proportionate interest calculated, without shareholder-level discounts for lack of control or lack of marketability.

Given the changes in dissenters' rights appraisal law in the thirty years since *Ford*—the General Assembly's adoption of the 1984 Model Act revision and the significant evolution the case law has undergone

elsewhere—we agree with the Court of Appeals that *Ford*'s value as precedent has become vanishingly slight. That leaves us face-to-face with KRS 271B.13–300, which entitles a properly dissenting shareholder to the "fair value" of his or her shares, and with KRS 271B.13–010(3), which, as repeatedly noted, merely defines "fair value" as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Again, this language offers little guidance but what is clear from Subchapter 13 as a whole is the General Assembly's intent to provide a meaningful remedy to minority shareholders in situations, such as the cash-out merger in this case, fraught with the potential for abuse by the majority shareholders. The legislature's choice of "fair value" as the measure of the minority shareholder's entitlement is significant in that it does not limit the remedy to the fair market value of the dissenter's shares, as Shawnee would have it, but contemplates that "fairness" may entail other considerations. Beyond this general intent to protect minority interests, however, the Kentucky statute is largely silent. Although the statute specifies as of when "fair value" is to be determined, it does not specify how, and so, to understand what is apt to have been the General Assembly's intent with respect to the "how" questions at issue here, we are must look outside the language of the statute itself.

When we do, as the discussion above indicates, we find a broad consensus among courts, commentators, and the drafters of the Model Act that "fair value" in this context is best understood, not as a hypothetical price at which the dissenting shareholder might sell his or her particular shares, but rather as the dissenter's proportionate interest in the company as a going concern. Arrived at only in the long course of many cases balancing the interest of the corporate majority in controlling their investment with the interest of the minority in fair treatment, this understanding reflects a reasonable balance of those competing interests. It does so by helping to insure that the majority's freedom to eliminate minority shareholders is not employed to transfer a portion of the minority interest to the majority, a result fully in keeping, we believe, with the General Assembly's intent. Because a hypothetical market price for the dissenter's particular shares as a commodity is thus not the value being sought, market adjustments to arrive at such a price, such as discounts for lack of control or lack of marketability, are inappropriate. This principled conclusion accounts for the broad consensus of courts writing in this area. We agree with the Court of Appeals, therefore, that *Ford* must be overruled to the extent that it endorses such shareholder-level discounts.[5] Although the Master Commissioner and the trial court in this case did not err by relying on *Ford* as the only available guidance from a higher Kentucky court at the time, our disavowal of it today requires that this case be remanded for reconsideration.

## C. The Delaware Block Method Is Not Controlling.

---

**5.** The *Brooks* majority did not address the propriety of entity-level discounts for a company's small size and private nature, discounts that we believe could be appropriate, as discussed below. Nor did the Court of Appeals in *Brooks* overrule *Ford*'s insistence on the old "Delaware block" approach to valuation, another aspect of *Ford* we conclude is erroneous. While the Court of Appeals' decision in *Brooks* was very effective in advancing Kentucky law on the issue of dissenters' appraisal rights, to the extent it is inconsistent with this Opinion it is overruled.

■ *Ford* must also be overruled to the extent that it requires adherence to the now long-superseded "Delaware block" method of valuing the company as a going concern. Although appraisers and courts remain free to consider market, income, and asset approaches to valuation and may employ a weighted average of the results of those approaches if the evidence supports such averaging, there is no suggestion in the statutes that the General Assembly meant to require that approach.[6] We have no hesitation in understanding instead a legislative intent that the value of the going concern be determined by any valuation technique generally recognized in the business and financial community and shown to be relevant to the circumstances of the particular company at issue. We hold, in sum, that in a KRS 271B.13 appraisal proceeding the dissenting shareholder is entitled to the fair value of his or her shares as measured by the proportionate interest those shares represent in the value of the company as a going concern, a value determined in accord with generally accepted valuation concepts and techniques and without shareholder-level discounts for lack of control or lack of marketability.[7]

**D. This "Fair Value" Standard Comports With Legislative Intent, And Does Not Award a Windfall to Dissenters.**

Against this general conclusion, Shawnee and the Amicus Kentucky Chamber of Commerce object that the rejection of a fair market value standard for a dissenting shareholder's shares, including discounts for those shares' lack of control and marketability, (1) is contrary to the General Assembly's intent as implicitly expressed in its not having enacted the Model Act's 1999 revised definition of "fair value"; (2) is inconsistent with valuation standards in other contexts; and (3) awards a windfall to dissenting shareholders and so threat-

---

6. Business appraisal, of course, is "as much an art as it is a science." *Blackstone v. Blackstone*, 288 Ill.App.3d 905, 224 Ill.Dec. 90, 681 N.E.2d 72, 78 (1997). As this case illustrates, even using the same technique, different experts commonly arrive at widely differing estimates of a business's value. The estimates are just that, not facts but opinions, educated but nevertheless highly subjective. They do not pretend to precision, but are meant to give a general idea of what the business can be thought worth to its owners. The business community has devised a number of techniques for making that estimate, and where more than one technique can be applied they may, to some extent, serve as checks upon each other. Different circumstances can favor different techniques, however, so a trial court is apt to find itself confronted by an array of estimates, none of which seems to account for all of the important factors but more than one of which seem to account for some of the factors. Although the trial court ought not simply throw all the estimates together and average them, *Gaskill v. Robbins*, 282 S.W.3d 306 (Ky.2009), neither is it obliged merely to pick one. Provided it can articulate its reasons for doing so, the court is free to make whatever use of the experts' appraisals it deems reasonable, including a weighted average if the evidence supports giving some weight to the estimates involved.

7. In *Brooks*, the Court of Appeals rejected a "bright line" rule against marketability discounts in favor of a rule permitting a discount "in exceptional circumstances." Quoting from a comment to the ALI Principles of Corporate Governance recommendation cited above, the Court of Appeals allowed for the application of a marketability discount if the trial court " 'finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to the appraisal so as to divert value to itself that could not be made proportionately to other shareholders.' " 325 S.W.3d at 914 (quoting from Principles of Corporate Governance: Analysis and Recommendations § 7.22 cmt. e (ALI 1994)). As this case does not present circumstances that could be thought exceptional, we need not address the contours of exceptional circumstances but we agree that such a caveat is appropriate.

ens to encourage dissents. We briefly address these objections.

With respect to the General Assembly's having not adopted the Model Act's 1999 revised definition of "fair value," absent a clear indication that the General Assembly considered the revision and deliberately rejected it, we agree with the Supreme Court of Wyoming that "[l]egislative inaction [is] ... a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute." *Brown v. Arp and Hammond Hardware Company*, 141 P.3d at 684 (quoting from Norman J. Singer, 2B *Statutes and Statutory Construction* § 49:10, p. 112–115 (6th ed.2000)). As noted, until the Court of Appeals' recent decision in *Brooks*, no appellate court in this state had addressed the "fair value" question under our current dissenters' rights statute. The General Assembly, then, has had no reason to be mindful of that question, but even assuming that it was, its inaction with respect to the Model Act's revised "fair value" definition is more apt to reflect a belief that no action was necessary than a deliberate rejection of the revision. This is so because the 1999 revision does not represent a departure from the meaning of "fair value" under the 1984 version of the Act, but rather a clarification of that meaning in light of the growing consensus after *Cavalier*. For this reason, as noted above, supreme courts in several states still using the 1984 Model Act revision have refused to find in their legislatures' inaction a deliberate rejection of the post-*Cavalier* approach. We concur in that analysis.

Shawnee also insists that the "fair value" standard here should be construed consistently with valuation standards in other contexts such as the market value standard applied in marital dissolution actions and in tax cases. The short answer to this objection is that there is no incon-

sistency in the General Assembly's adoption of different valuation standards in statutes serving different purposes. While a market value standard is appropriate in many circumstances, the purpose of the dissenters' rights statute is to protect minority shareholders. *See* Charles W. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and its Impact Upon Valuation of Minority Shares*, 65 Notre Dame L.Rev. 425 (1990) (distinguishing valuation for tax purposes, where a market standard helps to prevent confiscatory taxes, from valuation for dissenters' rights purposes, where a market standard would under-protect the minority shareholders). To effect that purpose the General Assembly has expressly rejected market value as the standard in favor of "fair value." Market value, after all, is usually understood as the price a willing buyer would pay a willing seller, both adequately informed and neither under an obligation to act. Minority shareholders cashed out of their shares at a price chosen by the majority can hardly be characterized as "willing sellers," so there is nothing surprising or inconsistent in these circumstances in the General Assembly's choice of a valuation standard more protective than market value. Logic, moreover, and long experience in the courts both teach that to the extent the minority shareholders may be divested of their shares for less than their *pro rata* share of the entity, as happens if the shares are reduced to market value, the majority will have an incentive to undertake the divestiture. This fact underscores the General Assembly's rejection in this context of a market value standard.

The same consideration answers the Amicus's concern that a dissenter, who may have acquired his or her shares for market value, receives a windfall if awarded more than market value in an appraisal. If the dissenter were a voluntary partici-

pant in the transaction we might agree. That is not the case, however. The appraisal remedy is available to minority shareholders being forced out of the company and who wish to keep what they have, which is a share of the going concern. There is nothing unfair about valuing the ousted shareholder's entitlement on that basis. Similarly, Shawnee's many attempts to characterize Brown's claim as a sort of nuisance suit ("Kathy Brown quit her job with Shawnee and demanded to be paid for her shares") and to raise the specter of such suits should Brown prevail, does not accurately reflect the circumstances. To be sure, Brown sought to withdraw from Shawnee and to be paid for her shares, but her demand for payment was not based in the first instance on the dissenters' rights statutes. It was based on a buy-sell provision in a Shareholders' Agreement among the four shareholders. Brown's statutory rights did not arise until Shawnee, for its own reasons, opted to cash out Brown pursuant to the merger into Shawnee Tel. These are not nuisance circumstances, but rather the conflict of interest circumstances for which the appraisal remedy has been found particularly appropriate.

Agreeing then with the Court of Appeals' disaffirmance of *Ford*, upon which the Master Commissioner and the trial court relied, we must remand this matter to the trial court for reappraisal under the standard we have described. The parties' other contentions we address only to the extent that they may recur on remand. To the extent that they are sufficiency of the evidence claims—for example Brown's contention that the evidence did not support giving any weight to the net asset method of appraising Shawnee, and Shawnee's contention that that should have been the only method given weight—they are now moot, since new evidence may be introduced at a rehearing.

### E. The Net Asset Method Can Be an Appropriate Method of Valuing a Company for Dissenters' Rights Purposes.

Brown claims that as a matter of law the appraisers' net asset approach to valuing Shawnee should have been disregarded. The Court of Appeals agreed with her but we do not. Net asset value is a standard business valuation approach, and in that approach one of the things the appraiser seeks to do is to establish the market value, as opposed to the book value, of the subject company's assets. Shannon P. Pratt, *Valuing a Business, The Analysis and Appraisal of Closely Held Companies*, Chapter 14 (5th ed.2008). Brown contends, and the Court of Appeals appears to have agreed, that this reference to "market value" somehow runs afoul of the statute's "fair value" standard. According to Brown, the statute precludes any reliance by the appraiser on market values. That is not what the "fair value" standard implies. In the statutory appraisal, what is being sought is the fair value of the dissenter's share of the company. That value, we have held, is not the hypothetical market value of the dissenter's particular shares, but rather his or her proportionate interest in the company as a going concern. The company's going concern value may very well be, indeed is almost certain to be, estimated by reference to market values of one sort or another. For example, market rates of return figure in to the estimation of the capitalization and discount rates employed in the various income methods. *Valuing a Business, supra.* Market-based valuation methods involve comparing the subject company to other companies for which a, market value can be determined. *Id.* The net asset valuation methods involve estimating the market value of the subject company's assets. *Id.* These entity-level market references are not precluded by

the "fair value" standard. What is precluded is a reduction in the dissenter's proportionate interest in the value of the company on the ground that if the dissenter were to sell his or her shares as such the price of those shares would be discounted because they are not readily marketable or because they do not represent a controlling interest in the company. On remand, therefore, the Commissioner, if appointed, and the trial court are free to consider net asset based estimates of Shawnee's value if any are presented.[8]

## F. Entity–Level Discounts, Where Supported by the Evidence, Are Acceptable.

■ This brings us to Shawnee's final contention, which is that even if the "fair value" standard precludes discounting the dissenter's shares for lack of marketability at the shareholder level, it does not preclude a marketability discount at the entity level. We agree but with the strong caveat, that any entity-level discount must be based on particular facts and authority germane to the specific company being valued, i.e., there can be no automatic 15–25% discount of the whole entity's value simply because it is closely held and not publicly traded. We also reiterate, as noted earlier, that recognized entity-level discounts that may be appropriate in a given case include, but are not limited to, a key manager discount, a limited customer or supplier base discount, a "trapped-in" capital gains discount, an environmental liability discount, a pending litigation discount, a "portfolio" discount, a small-size discount or a privately held company discount.[9]

As previously noted both experts in this case estimated Shawnee's value pursuant to the capitalized earnings method, and the Master Commissioner expressed frustration with the experts' inability to explain their choice of a capitalization rate, which, given Shawnee's near total reliance on a single customer and a single key manager, the Commissioner felt was too low. Brown's estimate under that method, which the Commissioner believed was otherwise more reliable than Shawnee's, was that Shawnee was worth $2,304,178. Relying on *Ford*, the Commissioner applied a 25% "marketability discount" to that amount before calculating Brown's 24% share. The Court of Appeals held that this discount was in essence the sort of shareholder-level discount improper under the "fair value" standard. Shawnee maintains to the contrary that it was an appropriate entity-level discount.

As noted above, the distinction between entity-level and shareholder-level discounts is recognized in the business valuation literature, Shannon P. Pratt, *Business Valuation Discounts and Premiums*, p. 3 (2001), and was referred to in *Cavalier*, where the Court observed that shareholder-level discounts, such as those for lack of control and lack of marketability, tend to defeat the protective purpose of the appraisal remedy by transferring a portion of the dissenter's interest in the company to the majority. Entity-level discounts, on the other hand, take into account those factors, such as a company's reliance on a key manager, that affect the value of the company as a whole. Pratt, *supra*. In *Rapid–American Corp. v. Harris*, 603 A.2d 796, 805–06 (Del.1992) the Supreme Court of Delaware noted that *Cavalier* "recognized the importance of assigning a

---

**8.** We caution, however, that what is being sought is the company's going concern value, not the mere liquidation value of its tangible assets. To the extent that the asset approach cannot yield a going concern value, we agree with the Court of Appeals that it should be given no weight.

**9.** *See* fn. 3 and accompanying text.

realistic market value to the appraised corporation.... [A]n appraisal valuation must include consideration of the unique nature of the enterprise.... *Cavalier* authorized corporate level discounting as a means of establishing the intrinsic value of the enterprise." Where such entity-level adjustments are proper, they should be incorporated into the valuation technique being employed, and the appraiser should be able to cite the relevant facts and authority for making the adjustment.

In *Borruso v. Communications Telesystems International,* 753 A.2d 451 (Del.Ch. 1999), the court rejected the sort of marketability discount the trial court applied here, but explained that a properly supported discount based on privately held companies selling at "valuation multiples substantially lower than publicly held corporations" could be appropriate.

> [T]o the extent Respondent is arguing for the application of a "corporate level" discount to reflect the fact that all shares of WXL were worth less because there was no public market in which to sell them, I read *Cavalier Oil* as prohibiting such a discount. This is simply a liquidity discount applied at the "corporate level." Even if taken "at the corporate level" (in circumstances in which the effect on the fair value of the shares is the same as a "shareholder level" discount) such a discount is, nevertheless, based on trading characteristics of the shares themselves, not any factor intrinsic to the corporation or its assets. It is therefore prohibited.

> Respondent argues, alternatively, that Kern's [the appraiser's] discount is justified on the basis of Kern's testimony about the existence of studies showing that privately held corporations sell at valuation multiples substantially lower than publicly held corporations. I agree with Respondent that, if the record supported this assertion, *Cavalier Oil* would not prevent taking such studies into account in determining the fair value of shares of a privately held corporation....

> The record in this matter is not adequate, however, to support the application of such a discount. The parties refer to Shannon P. Pratt, et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies,* 355–56 (3rd ed.1996). There Dr. Pratt discusses a study published in *Mergerstat Review 1994* (Los Angeles: Houlihan Lokey Howard & Zukin, 1995) at 107, which shows that for certain years during the period 1985–1994, private companies were acquired at lower median price/earnings ratios than were public companies. I note however, as does he, that during the last two years of the study, 1993 and 1994, the opposite effect is observed, *i.e.,* private companies sold for higher median p/e ratios than [public] companies. Discussing the general trend in earlier years, Dr. Pratt suggests that the relatively smaller size of the private companies may partly explain the observation. Here, of course, I have already discounted the median multiple derived from the comparable company method to account for WXL's small size. Dr. Pratt also refers to an article discussing the issue. Z. Christopher Mercer, *Should "Marketability Discounts" Be applied to Controlling Interests of Private Companies?* in Business Valuation Review, June 1994. Mr. Mercer argues against the application of such a discount based on the available data. Considering this evidence as a whole, I am unable to conclude that there is presently a sufficient theoretical support for the private company discount for which Respondent contends.

*Id.* at 460.

In *Ex parte Baron Services, Inc.,* 874 So.2d 545 (Ala.2003), the appraiser, as did

the appraisers here, based his estimate on a capitalized earnings analysis, and in deriving the capitalization rate included percentages in the discount rate to account for the facts that the subject company was small and closely held. The Alabama Supreme Court approved this "micro-capitalization risk premium" and a "company size premium" 874 S.2d at 551–52, to account for the differences between the company and larger public companies. Any additional marketability discount, that court held, such as the discount tacked on to the valuation here, was improper, not only because it was redundant but also because it was impermissibly based on the dissenter's share value.

As these cases indicate, Shawnee is correct to the extent that it insists that the "fair value" standard does not preclude the use of discounts and adjustments "at the entity level" to account for factors bearing upon the value of the company as a going concern. Any such adjustments should be made within the valuation technique being employed, however, and there should be support for the adjustment in the business and financial community. Here, for example, in deriving his capitalization rate, Shawnee's appraiser added a "size premium" of 6.34% and a "specific company risk" factor of 15.00%. Assuming that private companies are indeed discounted more steeply than comparable public ones (Shawnee presented no evidence of this, however), that fact could have been and may well have been reflected in this risk analysis. The additional marketability discount employed by the Commissioner and trial court was improper, therefore, both because it was redundant and because it was based on the perceived illiquidity of Shawnee's shares—the sort of discount the "fair value" standard disallows. On remand, Shawnee is free to present evidence tending to show that its going concern value is lessened by such factors as its small size and its private nature, but otherwise it is not entitled to a discount based simply on the generally perceived lack of marketability of closely held corporate shares.

### CONCLUSION

In sum, we agree with the Court of Appeals that *Ford* has outlived its usefulness and does not provide a suitable interpretation of the appraisal remedy currently available under KRS Subchapter 271B.13. Under that subchapter, a properly dissenting shareholder is entitled to the "fair value" of his or her shares, which is the shareholder's proportionate interest in the value of the company as a whole and as a going concern. Going concern value is to be determined in accord with the concepts and techniques generally recognized and employed in the business and financial community. Although the parties may, and indeed are encouraged to, offer estimates of value derived by more than one technique, the trial court is not obliged to assign a weight to or to average the various estimates, but may combine or choose among them as it believes appropriate given the evidence. If the particular technique allows for them, adequately supported entity-level adjustments may be appropriate to reflect aspects of the company bearing positively or negatively on its value. Once the entire company has been valued as a going concern, however, by applying an appraisal technique that passes judicial muster, the dissenting shareholder's interest may not be discounted to reflect either a lack of control or a lack of marketability. Because the trial court here based its appraisal on *Ford* and on standards not in complete harmony with the "fair value" standard of our current statutes, we agree with the Court of Appeals that the appraisal order must be vacated and the matter returned

to the trial court for additional proceedings. Accordingly, for the reasons stated, we reverse in part and affirm in part the decision of the Court of Appeals and remand this matter to the trial court for further proceedings consistent with this Opinion.

All sitting. All concur.