RENDERED: AUGUST 26, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0454-DG

LINDSEY WILSON APPELLANT


ON REVIEW FROM COURT OF APPEALS
V. NO. 2018-CA-1087
FAYETTE CIRCUIT COURT
NO. 17-CR-00596-001


COMMONWEALTH OF KENTUCKY APPELLEE


AND


2019-SC-0660-DG

CRAIG MILNER APPELLANT


ON REVIEW FROM COURT OF APPEALS
V. NO. 2018-CA-1547
FAYETTE CIRCUIT COURT
NO. 18-CR-000227


COMMONWEALTH OF KENTUCKY APPELLEE


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**AFFIRMING, AND AFFIRMING AND REMANDING**

In this consolidated appeal, Appellants Lindsey Wilson (Wilson) and

Craig Milner (Milner) ask this Court to interpret, as a matter of first impression,

KRS[1] 218A.133, which is more commonly referred to as the "Good Samaritan" or "Medical Amnesty" Statute.[2] KRS 218A.133 offers immunity from prosecution for the crimes of possession of a controlled substance and possession of drug paraphernalia if the requirements of the statute are satisfied. The Appellants seek review of the Court of Appeals' holdings in their respective cases that the Medical Amnesty Statute does not grant them immunity from prosecution.

We affirm the Court of Appeals' holdings in both cases that the Medical Amnesty statute is inapplicable, though we reach that conclusion for different reasons.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Although we have consolidated the Appellants' respective appeals, they arose from distinct criminal proceedings. We therefore discuss the facts of each Appellants' case in turn.

---

[1] Kentucky Revised Statute.

[2] We recognize that 218A.133 is predominantly referred to as the "Good Samaritan" statute. However, we elect to refer to it by the more appropriate title of the "Medical Amnesty Statute" to avoid confusion. KRS 411.148, which preceded KRS 218A.133, is referred to as the "Good Samaritan" statue or act. *See Phillips v. Lexington-Fayette Urban County Government*, 331 S.W.3d 629, 633 (Ky. App. 2010); *Fann v. McGuffey*, 534 S.W.2d 770, 784 (Ky. 1975). KRS 411.148 prohibits the civil liability of certain medical professionals for "administering emergency care or treatment at the scene of an emergency outside of a hospital, doctor's office, or other place having proper medical equipment excluding house calls, for acts performed at the scene of such emergency, unless such acts constitute willful or wanton misconduct." In contrast, KRS 218A.133 provides protection from criminal liability for those that seek emergency medical assistance during an overdose. Thus, we elect to refer to the statute as the "Medical Amnesty Statute."

## A. Wilson

In June of 2017, Wilson was indicted on one count each of possession of a controlled substance, possession of drug paraphernalia, operating a motor vehicle under the influence of a controlled substance (DUI), and driving with expired registration plates. Four months later, she filed a motion to dismiss the counts of possession of a controlled substance and possession of drug paraphernalia. Her motion asserted that she qualified for immunity from prosecution for those crimes under the Medical Amnesty Statute.

During the hearing on Wilson's motion to dismiss Officer Rebecca Saylor (Ofc. Saylor) testified about the circumstances that led to Wilson's arrest. On April 13, 2017, at around 5:45 p.m., Ofc. Saylor received a request to respond to a 911 call. Dispatch informed Ofc. Saylor that a female complainant named Alice[3] called 911 and advised that there were two unknown females "slumped over" in a running car in the driveway of her home. The vehicle was a maroon Ford sedan with "dark tinted windows." Alice and her husband were in their backyard when she noticed the vehicle. She did not recognize the car, and she confirmed with her husband that they were not expecting company. Alice then went out to the car and knocked on the window in an attempt to wake the occupants. When she failed to rouse them, she called 911. The 911 call was not introduced as an exhibit during the hearing, and Alice did not testify.

---

[3] We refer to the 911 callers in both Wilson's and Milner's cases by pseudonym to protect their anonymity.

When Ofc. Saylor arrived, she observed Wilson in the driver's seat with her head tilted back between the head rest and the door. Wilson's passenger was in the front passenger seat slumped forward with his head almost touching the dashboard. The passenger, who had been reported by Alice to be a female, was actually a male with long hair. Ofc. Saylor knocked on the vehicle's window with her fist, but was unable to wake either Wilson or her passenger. She then went around to each of the vehicle's doors to see if any were unlocked. As she was doing this, she noticed a "plastic cap with what appeared to be sticky residue in the cap and on the center console, and a couple of blue tourniquets." Ofc. Saylor testified that the presence of these items indicated to her that she could have been dealing with a drug use and DUI situation. After she established that none of the doors were unlocked, she began banging on one of the windows with the non-metal end of her baton. This woke the vehicle's occupants.

Wilson then complied with Ofc. Saylor's commands to turn the car off and open her door. Ofc. Saylor observed that Wilson was unsteady on her feet, had pinpoint pupils and slurred speech, and was very confused. By the time Ofc. Saylor woke Wilson up an ambulance had arrived on scene. Wilson was evaluated by EMS, did not need a Narcan shot, and refused further medical treatment. There was no evidence that Alice requested an ambulance during the 911 call. Rather, the ambulance was sent by the 911 operator automatically. After Wilson was evaluated by EMS, Ofc. Saylor placed her

4

under arrest and searched her vehicle. During that search, the officer found four metal spoons with suspected drug residue, two burnt crack pipes with Chore Boy[4] in them, some additional Chore Boy that was not in a pipe, a "corner baggie," nine needles with suspected heroin residue, and an unidentified crushed pill.[5] Additionally, the "sticky residue" in the plastic cap that Ofc. Saylor observed in plain sight was later determined to be heroin.

With regard to why Alice called 911, the Commonwealth elicited the following testimony:

> **CW:** And [Alice] didn't indicate to you at any point that [she] was calling to get them help.
>
> **Ofc. Saylor:** Not to my knowledge … she said something about, she was kind of laughing about it, chuckling like, this is weird, kind of crazy thing happened, you know, how did this happen to her type [of] house … but I don't remember her specifically saying "I called because I thought they were having an overdose." I remember her calling because she had an unknown vehicle in her front yard with unknown occupants in it.

The circuit court ultimately ruled that the Medical Amnesty Statute did not apply to Wilson's case, and she was therefore not immune from prosecution for possession of a controlled substance and possession of drug paraphernalia. The court interpreted the statute to require that the 911 caller seek assistance with a drug overdose, and that it was unclear why Alice called 911. Following

---

[4] A Chore Boy is a copper kitchen scouring pad that can be used as a filter in crack pipes.

[5] Though the unidentified crushed pill was sent to the Kentucky State Police laboratory for identification, that lab report is not in the record before us.

that ruling, Wilson entered a conditional guilty plea for possession of a controlled substance (heroin), possession of drug paraphernalia, and DUI.[6] She reserved the right to appeal the circuit court's ruling regarding the application of the Medical Amnesty Statute.

> A unanimous Court of Appeals panel affirmed, and reasoned that it is incumbent that medical assistance is sought in good faith from emergency personnel for a drug overdose to trigger the immunity provision of KRS 218A.133. In this case, the caller did not know the occupants or whether a drug overdose had occurred. The caller reported an unknown vehicle parked in her driveway with nonresponsive occupants. Thus, we do not view as erroneous the circuit court's finding that it was unclear whether the caller summoned police due to a drug overdose.[7]

Wilson now appeals to this Court requesting a determination of whether the Medical Amnesty Statute applies to her case.

**B. Milner**

Milner was indicted in February of 2018, on one count each of possession of a controlled substance, possession of drug paraphernalia, and public intoxication. In August of that year he filed a motion to dismiss the counts of possession of a controlled substance and possession of paraphernalia pursuant to the Medical Amnesty Statute.

During the hearing on his motion to dismiss, both the arresting officer's testimony and the complainant's 911 call were presented. During the 911 call the complainant, Jane, told the operator that she pulled into a Home Depot

---

[6] The count of driving with expired registration plates was dismissed pursuant to Wilson's conditional plea agreement.

[7] *Wilson v. Commonwealth*, 2018-CA-001087-MR, 2019 WL 3059968, *3 (Ky. App. July 12, 2019).

parking lot and saw a man "very definitely passed out" in the front seat of his car. While on the phone with the operator, Jane drove around the car in order to determine the model of the car and its license plate number. She then provided the man's race and a description of his clothing and said, "he's just hunched over." The operator told Jane that she was sending an ambulance and a police officer. To this, Jane responded, "he could just be drunk but I don't know what's going on." The operator replied, "it could be medical, you don't know." Jane never indicated that she approached the man or attempted to wake him.

Officer Christopher Carrington, (Ofc. Carrington), responded to the call at around 3:34 p.m. on December 26, 2017. When Ofc. Carrington arrived, he observed Milner passed out in his running vehicle with the driver's side door open. Ofc. Carrington approached Milner's vehicle and loudly yelled out to him "hey man," at which point Milner immediately awoke. As Ofc. Carrington was standing next to Milner's driver's side door he spotted a glass pipe that appeared to be a crack pipe and a small baggie of an unknown substance sitting on top of the middle console.

Milner complied with the officer's subsequent request to exit his vehicle. Ofc. Carrington asked Milner what he was doing there, and Milner replied that he was tired and must have fallen asleep. As their conversation continued, Milner kept putting his hands in his pockets against Ofc. Carrington's verbal warnings to stop. Ofc. Carrington noted that, as it was December, it was cold outside, and he believed that Milner was trying to stay warm. He therefore told

7

Milner that if he allowed the officer to search his pockets, he would let him keep his hands in his pockets for warmth. Milner consented to the search, during which Ofc. Carrington found a small circular glass Christmas ornament.[8] The ornament had a hole in the bottom, an obvious burn mark, and white powder residue. Ofc. Carrington realized at that time that Milner was under the influence of something based on his failure to comply with his basic directions, in addition to his slurred speech, bloodshot watery eyes, and "mannerisms."

Milner was placed under arrest for public intoxication, and Ofc. Carrington searched his vehicle. The officer recovered two baggies containing methamphetamine as well as the pipe he had observed earlier. Milner later admitted to Ofc. Carrington that he smoked methamphetamine out of the ornament earlier that day. An ambulance came to the scene, but Narcan was not administered.

Following the hearing, the circuit court entered an order that granted Milner's motion in part and denied it in part. However, the court mischaracterized the relief sought by Milner: Milner requested dismissal of the charges of possession of a controlled substance and possession of drug paraphernalia, but the court ruled as though it was a motion to suppress the evidence found in connection with those charges. The court therefore ordered

---

[8] Three white pills were also found during the search, but it was later determined that Milner had a prescription for them. Ofc. Carrington elected not to charge Milner for having the pills out of their original container.

8

that the evidence the officer witnessed in plain sight be suppressed under the Medical Amnesty Statute. It reasoned that the evidence observed in plain sight was the result of Jane's good faith call to 911 for medical assistance, and was therefore covered by the statute. However, once Milner exited his vehicle the officer's focus shifted from providing medical aid to an investigation for public intoxication. Therefore, the evidence found in Milner's pockets was not covered by the statute and should not be suppressed. The Commonwealth then appealed the circuit court's ruling to the Court of Appeals.

A unanimous Court of Appeals panel vacated the circuit court's order and remanded.[9] Its basis for reversing was that the Medical Amnesty Statute provides total immunity from prosecution, and therefore suppression of the evidence was not the proper remedy.[10] The court then elected to address whether the circuit court was correct in applying the Medical Amnesty Statute, in part, to Milner's case.[11]

The Court of Appeals held as a preliminary matter that in a hearing concerning the application of the Medical Amnesty Statute, the burden is on the defendant to prove by a preponderance of the evidence that the statute applies.[12] It then held that the Medical Amnesty Statute did not apply to Milner's case, and expounded that

---

[9] *Commonwealth v. Milner*, 2018-CA-001547-MR, 2019 WL 5280800, *4 (Ky. App. Oct. 18, 2019).

[10] *Id.*

[11] *Id.*

[12] *Id.* Neither Milner nor the Commonwealth requested review of this holding.

9

[t]he statute clearly requires a defendant establish that "[t]he evidence for the charge or prosecution" be "obtained *as a result of the **drug overdose** and the **need for medical assistance**.*" (emphasis added). The language of the statute requires a drug overdose – not a "perceived drug overdose," an "apparent drug overdose," or a "presumed overdose." Likewise, the language requires the need for medical assistance – not the "perceived need for medical assistance," an "apparent need for medical assistance," or the "presumed need for medical assistance." The language of

subsection (2)(c) is in objective terms. Its application does not turn on the subjective belief of the individual seeking medical assistance.[13]

Like Wilson, Milner now seeks review from this Court to determine whether the Medical Amnesty Statute is applicable to his case.

## II. ANALYSIS

### A. Kentucky's Medical Amnesty Statute.

KRS 218A.133 was enacted in March of 2015 as a component of Senate Bill 192 (S.B. 192), a comprehensive "anti-heroin bill." Following its passage, former Governor Steve Beshear remarked that S.B. 192 was a "muscular approach [to the heroin epidemic] designed to impact users, sellers, law enforcement and public health."[14] Overall, S.B. 192 was designed to offer

> multiple tactics to reduce the trafficking and abuse of heroin. Traffickers [would] face stiffer penalties, particularly if heroin [was] transported across state lines. More money [was] allocated for addiction treatment. A [Medical Amnesty] provision [gave] users legal immunity if they report an overdose victim. The bill also [authorized] more use of the anti-overdose drug naloxone, and [allowed] communities the option of setting up needle exchanges.[15]

---

[13] *Id.* at *3.

[14] Kentucky Governor's Message, 2015 Reg. Sess. S.B. 192.

[15] *Id.*

The Medical Amnesty Statute in particular was passed with the primary goal of preventing overdose deaths whether from heroin or other controlled substances.  The statute sought to accomplish this goal by offering immunity from prosecution for possession of a controlled substance and/or possession of drug paraphernalia[16]  if an individual seeks emergency medical assistance with an overdose.  In other words, it was intended to alleviate the concern of individuals who choose not to seek emergency medical assistance during a possible overdose because they fear the prosecution of either themselves or someone else.  As stated more succinctly by Kentucky's Office of Drug Control Policy,

> [c]alling 911 during an overdose can mean the difference between life and death, but some witnesses avoid calling due of fear of arrest.  In response, Kentucky has enacted KRS 218A.133, which protects people from prosecution when they report a drug overdose.  This is commonly known as a ["Medical Amnesty Law,"] and it provides an important tool to save lives.  There is no longer any need to watch a friend or family member die due to a fear of criminal prosecution.[17]

A tragic, yet illustrative example of a situation KRS 218A.133 was meant to address is that of a Kentucky State Representative's nephew, who died of a heroin overdose.  In 2015, she shared during a legislative committee that her nephew "was with someone who wasn't doing drugs, who isn't a drug user and she did not call when he overdosed because she did not want to get him in

---

[16] KRS 218A.133(2).

[17] Kentucky Office of Drug Control Policy, *Stop Overdoses, Kentucky Takes Action to Reverse Opiate Overdoses*, https://odcp.ky.gov/stop-overdoses/Pages/default.aspx (last accessed June 28, 2021).

trouble[.]"[18]  In addition, the statute can be applicable when the person

experiencing the overdose seeks emergency medical assistance for themselves[19]

and to individuals who act in concert with someone who requests emergency

medical assistance.[20]  It should also be noted that there is no requirement

under KRS 218A.133 that the person seeking assistance must know the person

experiencing the potential overdose.  That is to say, under certain

circumstances, the statute can apply when someone seeks emergency medical

assistance for a stranger.

We now address the cases at bar.

**B. Standard of Review**

Preliminarily, we must address the parties' disagreement about the

standard of review this Court should utilize.  The Commonwealth asserts that a

ruling on a motion to dismiss an indictment is generally subject to review

under an abuse of discretion standard.  The Appellants counter that, as these

cases require us to interpret the Medical Amnesty Statute, we should conduct a

de novo review.  We agree with the latter.  To determine whether the Medical

Amnesty Statute applies to the Appellants' cases, we must interpret that

statute's definition of "overdose" as a matter of first impression.  "Because

---

[18] Ryland Barton, *Kentucky Prosecutor Wants 'Good Samaritan' Policy Out of Anti-Heroin Law,* https://wfpl.org/kentucky-prosecutor-wants-good-samaritan-policy-out-of-anti-heroin-law/ (last accessed June 22, 2021).

[19] KRS 218A.133(2)(a)(1).

[20] KRS 218A.133(2)(a)(2).

statutory interpretation is a question of law, our review is de novo; and the conclusions reached by the lower courts are entitled to no deference."[21]

However, while we are not bound by the decisions below, we are obliged to construe KRS 218A.133 under certain well-established principles of statutory interpretation. First and foremost, this Court must always bear in mind that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]"[22] Therefore, when interpreting a statute, our responsibility is to give effect to the intent of the General Assembly.[23] "We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration."[24] In addition, we must assume that the General Assembly intends that a statute be read as a whole such that each of its constituent parts have meaning.[25] And, in interpreting a statute, we must assume that the General Assembly did not intend for an interpretation that would lead to an absurd result.[26]

In addition, we acknowledge the Commonwealth's inclusion of case law from other states regarding how those states interpret their respective Medical

---

[21] *Commonwealth v. Love*, 334 S.W.3d 92, 93 (Ky. 2011).

[22] KRS 446.080(1).

[23] *Maynes v. Commonwealth*, 361 S.W.3d 922, 924 (Ky. 2012).

[24] *Id.*

[25] *Id.*

[26] *Id.*

Amnesty Statutes. However, we feel resorting to other states' cases for extrinsic aid is unnecessary, as KRS 218A.133 is sufficiently unambiguous.[27]

## C. Whether a 911 caller sought assistance with a "drug overdose" under KRS 218A.133(1)(a) must be determined objectively from the 911 caller's perspective, and whether the caller's belief was reasonable is to be judged by an objective standard.[28]

This appeal requires this Court to interpret the Medical Amnesty Statute's definition of "overdose." The statute itself is therefore a good place to start. The Medical Amnesty Statute provides in its entirety:

(1) As used in this section:

(a) "Drug overdose" means an acute condition of physical illness, coma, mania, hysteria, seizure, cardiac arrest, cessation of breathing, or death which reasonably appears to be the result of consumption or use of a controlled substance, or another substance with which a controlled substance was combined, and that a layperson would reasonably believe requires medical assistance; and

(b) "Good faith" does not include seeking medical assistance during the course of the execution of an arrest warrant, or search warrant, or a lawful search.

(2) A person shall not be charged with or prosecuted for a criminal offense prohibiting the possession of a controlled substance or the possession of drug paraphernalia if:

(a) In good faith, medical assistance with a drug overdose is sought from a public safety answering point, emergency medical services, a law enforcement officer, or a health practitioner because the person:

---

[27] *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011) ("Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as … interpretations by other courts.").

[28] We acknowledge that medical assistance will not always be sought via a 911 call. Our reference to a "911 caller" throughout this opinion should not preclude the holdings in this case from being applied when medical assistance is sought through other means.

14

1. Requests emergency medical assistance for himself or herself or another person;

2. Acts in concert with another person who requests emergency medical assistance; or

3. Appears to be in need of emergency medical assistance and is the individual for whom the request was made;

(b) The person remains with, or is, the individual who appears to be experiencing a drug overdose until the requested assistance is provided; and

(c) The evidence for the charge or prosecution is obtained as a result of the drug overdose and the need for medical assistance.

(3) The provisions of subsection (2) of this section shall not extend to the investigation and prosecution of any other crimes committed by a person who otherwise qualifies under this section.

(4) When contact information is available for the person who requested emergency medical assistance, it shall be reported to the local health department. Health department personnel shall make contact with the person who requested emergency medical assistance in order to offer referrals regarding substance abuse treatment, if appropriate.

(5) A law enforcement officer who makes an arrest in contravention of this section shall not be criminally or civilly liable for false arrest or false imprisonment if the arrest was based on probable cause.[29]

The parties agree about the subsections that are arguably applicable to both of the Appellant's cases. Therefore, for the sake of simplicity, we have distilled the statute down into the requirements that they both must meet to be entitled to immunity. Those requirements are as follows:

---

[29] KRS 218A.133.

In good faith, medical assistance with an acute condition of physical illness, which reasonably appears to be the result of consumption or use of a controlled substance, and that a layperson would reasonably believe requires medical assistance,[30] is sought from a public safety answering point, emergency medical services, or a law enforcement officer, because the person:[31]

> Appears to be in need of emergency medical assistance and is the individual for whom the request was made;[32]
>
> The person is the individual who appears to be experiencing a drug overdose;[33] and
>
> The evidence for the charge or prosecution is obtained as a result of the drug overdose and the need for medical assistance.[34]

While each element of the foregoing test must be met to trigger immunity from prosecution, the dispositive issue in this case concerns only the first element. Specifically, whether the 911 callers in the Appellants' cases sought medical assistance with a "drug overdose," i.e., with an "acute condition of physical illness, which reasonably appears to be the result of consumption or use of a controlled substance, and that a layperson would reasonably believe requires medical assistance." Both Appellants contend that they experienced an "overdose," as that term is defined by statute. Because of this, they assert that Alice and Jane sought assistance for them with an overdose, and that they are therefore entitled to immunity.

---

[30] KRS 218A.133(1)(a).

[31] KRS 218A.133(2)(a).

[32] KRS 218A.133(2)(a)(3).

[33] KRS 218A.133(2)(b).

[34] KRS 218A.133(2)(c).

The Appellants make identical arguments regarding how they believe the definition of overdose should be interpreted. They contend that the General Assembly intentionally defined overdose in broad, objective terms. More specifically, that the General Assembly's use of the "reasonable person" standard requires us to interpret the definition of overdose from an objective standpoint. Accordingly, they argue that in order to decide whether an "overdose" occurred, and by extension whether the 911 caller sought help with an overdose, we must look at the objective facts available to any reasonable person observing the scene. And, if a reasonable person could conclude that an overdose is occurring based on all the objective facts available, then the element of the statutory definition of overdose that it "reasonably appears to be the result of consumption or use of a controlled substance" is satisfied. While we agree with this interpretation, we do not agree that the standard is satisfied in this case.

In Wilson's case, she argues that the objective facts available to any reasonable person were that she and her passenger were passed out in a running car and that "heroin and drug paraphernalia were visible in the car." Therefore, Wilson met the definition of "overdose" under the statute, and Alice sought medical assistance for her with an overdose. This is so, Wilson's argument goes, even though there was no indication that Alice herself observed the "cap with sticky residue" or the tourniquets in the car.

Likewise, in Milner's case, the objective facts available to any reasonable person were that Milner was passed out in a running car with the driver's side

door open in December. And, that "drugs and paraphernalia were in plain sight." Milner therefore asserts that he experienced an overdose under the statute, and that Jane sought medical assistance with an overdose for him even though there was no indication that Jane ever saw anything other than Milner passed out.

> The definition of "drug overdose" the General Assembly chose is an acute condition of physical illness, coma, mania, hysteria, seizure, cardiac arrest, cessation of breathing, or death which reasonably appears to be the result of consumption or use of a controlled substance, or another substance with which a controlled substance was combined, and that a layperson would reasonably believe requires medical assistance[.][35]

The "reasonable person" standard is an often-utilized term of art that involves an inherently objective test: a reasonable person is "a person who exercises the degree of attention, knowledge, intelligence, and judgment that society requires of its members for the protection of their own and of others' interests. The reasonable person acts sensibly, does things without serious delay, and takes proper but not excessive precautions."[36] Significantly, it is a standard that the General Assembly has chosen to utilize in other definition statutes. For example, in the statutory definitions of the culpable mental states of wantonness and recklessness, respectively:

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the

---

[35] KRS 218A.133(1)(a).

[36] *Reasonable Person*, Black's Law Dictionary (8th ed. 2004).

18

standard of conduct that **a reasonable person** would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.[37]

A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that **a reasonable person** would observe in the situation.[38]

We therefore hold that the General Assembly intended for the "drug overdose" determination to be made under an objective "reasonable person" standard, although the caller's actual intent in calling 911, whether to seek medical assistance or not, a separate element, is a subjective inquiry. The "reasonableness" language of the statute imposes an objective standard that cannot be omitted from our consideration. Accordingly, as discussed in more detail below, we believe the appropriate interpretation of the statutory definition of "drug overdose" requires an evaluation of the circumstances objectively available to the caller at the time of the call, and whether a reasonable person in the caller's position would suspect a drug overdose. Separately, the good faith and the specific purpose in making the call are elements that amount to a subjective question, generally "Did this particular caller have the good faith purpose of seeking medical assistance, or did she intend to report a crime or attempt to accomplish some non-medical end?"

---

[37] KRS 501.020(3) (emphasis added).

[38] KRS 501.020(4) (emphasis added).

19

Our interpretation is bolstered by consideration of the very reason the Medical Amnesty Statute was enacted. The purpose of the statute is to alleviate the chilling effect that fear of prosecution has on an individual that might otherwise seek emergency medical assistance during what they perceive to be a possible overdose. The statute is therefore meant to relieve that inherently subjective trepidation, while still setting out separate elements like "drug overdose" in objective terms simply to ensure only reasonable calls receive the benefit of amnesty. We consequently do not believe it would promote the intent or purpose of the General Assembly to interpret the statute in a way that grants immunity to a defendant where the person calling for medical assistance had no objective basis upon which to reasonably conclude that the defendant's acute physical condition was the result of controlled substance use, or where the caller did not seem subjectively to intend to call for medical assistance with a suspected overdose.

Though, to be clear, we do not hold that the person for which medical assistance was sought must *actually* overdose as that term is understood colloquially. From simply a commonsense perspective, there likely is no way to be certain that someone is overdosing until it is too late. But more importantly, to interpret the statute in that way would lead to an absurd result. The statute was passed to eliminate the chilling effect that fear of prosecution has on an individual that might otherwise seek medical assistance. If the statute were to require that the individual *actually* overdose in order to receive immunity, the statute would replace one chilling effect with another. Instead of

20

hesitating to call 911 out of fear of prosecution, a potential 911 caller would now fear that, if the person for whom he or she calls 911 is not *actually* overdosing, then that individual would not receive immunity under the statute. And, finally, we suspect that if the General Assembly intended that the statute only grant immunity to someone who has actually overdosed, they would not have included a specific definition of drug overdose in the statute. Instead, they could have simply required under the statute that the person seeking immunity must have experienced an actual, medical overdose.

Instead, rather than suffering an actual overdose, the person for whom medical assistance was sought need only meet the statutory definition of overdose. That definition, in turn, has three components that must be satisfied. First, the person must have "an acute condition of physical illness, coma, mania, hysteria, seizure, cardiac arrest, cessation of breathing, or death."[39] Second, that physical condition must "reasonably appear[] to be the result of consumption or use of a controlled substance, or another substance with which a controlled substance was combined."[40] And, third, the physical condition must be such that "a layperson would reasonably believe [it] requires medical assistance."[41]

The second element is the dispositive issue in this case and it therefore necessitates additional discussion. As mentioned, the first element requires

---

[39] KRS 218A.133(1)(a).

[40] *Id.*

[41] *Id.*

that the person for which medical assistance is sought have one of the physical

conditions listed in the statute. The second element then mandates that the

physical condition "reasonably appears to be the result of consumption or use

of a controlled substance." But whether the physical condition appears to be

the result of the use of a controlled substance should be analyzed using an

entirely objective, "reasonable person" standard. Thus, the question that

remains is: to whom must it reasonably appear that the physical condition is

the result of the use of a controlled substance? Once again, using the General

Assembly's purpose in passing the statute as our guide, we can reach only one

answer: it is the person calling for medical assistance. Therefore, in order to

determine whether the second element is satisfied, a court must ascertain the

facts that were known to the caller. It must then determine whether it was

objectively reasonable for that caller to conclude, based on those facts, that the

physical condition was the result of the consumption or use of a controlled

substance.

Stated differently, when a trial court addresses a motion to dismiss an

indictment under KRS 218A.133, its analysis should be as follows. First, it

should determine the facts and circumstances of the alleged overdose from the

viewpoint of the caller.[42] In other words, what was the caller able to observe

that could lead them to conclude that the individual's physical condition was

the result of the use of a controlled substance? Second, the trial court should

---

[42] Although this determination is made from the perspective of a person in the caller's position, from a specific vantage point, the inquiry remains objective.

22

determine whether, under those observable facts and circumstances, it would be objectively reasonable for the caller to conclude that the individual's physical condition was the result of controlled substance use. If the trial court determines that the caller's conclusion was objectively reasonable, based on the facts and circumstances at the time known to them, then the second element of the statutory definition of "overdose" under KRS 218A.133(1)(a) is satisfied.

With this test in mind, we now address whether the Medical Amnesty Statute is applicable to either of the Appellants' cases.

### D. Neither Appellants' 911 caller sought assistance with an "overdose." They are therefore not entitled to immunity under the Medical Amnesty Statute.

As we have previously mentioned, all of the elements of KRS 218A.133(2) must be satisfied in order for a defendant to be entitled to immunity from prosecution. Because the facts of the Appellants' cases do not meet the statutory definition of a "drug overdose," they cannot demonstrate that medical assistance with an overdose was sought for either of them. It was not objectively reasonable for these callers to suspect a drug overdose, and in any case, it would not appear the case that either caller had a subjective intent of seeking medical assistance for the Appellants. Therefore, the Appellants' respective cases fail to satisfy both KRS 218A.133(1)(a) and 218A.133(2)(a), and they are not entitled to immunity.

### 1) *Wilson*

23

Preliminarily, we note that there is certainly a strong argument in Wilson's case that Alice was not seeking medical assistance at all, let alone medical assistance with an overdose. Rather, she simply wanted the police to aid her in removing an unknown vehicle and its occupants from her property. But, even assuming arguendo that she was calling for medical assistance, she had no basis upon which to reasonably conclude that Wilson's acute physical condition was the result of controlled substance use.

Alice observed two individuals she did not know passed out in a running vehicle in her driveway. She approached the vehicle, briefly attempted to wake them, and then called 911. And, though the "cap with sticky residue" and the tourniquets were in plain sight, there was no evidence to suggest that Alice saw them. The vehicle had dark tinted windows, and Ofc. Saylor herself did not immediately notice either the cap or the tourniquets. Couple this with Alice's misidentification of Wilson's passenger as a female, and the fact that she apparently did not say anything to the 911 operator about seeing them, and it seems unlikely that she saw the cap or tourniquets. Further, Alice did not interact with Wilson and therefore did not observe Wilson's unsteadiness on her feet, pinpoint pupils, slurred speech, and confusion. Indeed, the only thing Alice observed that could indicate that Wilson's physical condition was the result of the use of a controlled substance was the fact that she was passed out.

Notwithstanding, being passed out, though serious, would generally not in and of itself be a basis for it to reasonably appear to Alice that Wilson's

24

condition was the result of the consumption of a controlled substance. There are many medical reasons that might cause a person to pass out that have nothing to do with a drug overdose: a drop-in blood pressure or blood sugar, a seizure, a stroke, a heart attack, etc. But, to be fair, the fact that both Wilson and her passenger were passed out could have indicated that it was not a medical episode, as it is unlikely that both Wilson and her passenger would have such a medical episode simultaneously. However, as a general rule, without something more to indicate that they had consumed a controlled substance specifically, Alice could have just as reasonably concluded that the pair were drinking together and were passed due to alcohol consumption.

Consequently, based on the facts known to Alice, it could not have reasonably appeared to her that Wilson's physical condition was the result of the use of a controlled substance. Wilson's condition therefore did not satisfy the Medical Amnesty Statute's definition of "drug overdose," and she is accordingly not entitled to immunity under it.

### 2) *Milner*

First, we agree with the Court of Appeals' holding that the circuit court in Milner's case erred by providing Milner with inappropriate relief under the Medical Amnesty Statute. If a circuit court finds that the statute is applicable, the appropriate relief is to dismiss the charges of possession of a controlled

25

substance and/or possession of drug paraphernalia, not suppress the evidence related thereto.[43]

Next, as in Wilson's case, there was no evidence to suggest that Milner's physical condition could have reasonably appeared to Jane to be the result of the consumption of a controlled substance. The only thing Jane observed was Milner passed out in his car in a public parking lot with the car door open in December. There was no evidence that she approached Milner's vehicle in an attempt to wake him or render aid. It would therefore have been impossible for her to personally observe the pipe or baggies of methamphetamine that Ofc. Carrington later observed in plain sight. And, because Jane did not interact with Milner, she did not personally observe Milner's bloodshot, watery eyes or his slurred speech. Further, Jane told dispatch, "[Milner] could just be drunk but *I don't know what's going on.*" The only thing she personally observed was that Milner was passed out. And, again, he could have been passed out for any number of reasons that have nothing to do with a drug overdose.

Thus, from the totality of the circumstances as they appeared from Jane's perspective, Milner's acute physical condition could not have reasonably appeared to her to be the result of the use of a controlled substance under an objective standard of reasonableness. Milner's physical condition therefore did not satisfy the statutory definition of an overdose, and he is not entitled to immunity under the Medical Amnesty Statute.

---

[43] *See* KRS 218A.133(2).

### III. CONCLUSION

Based on the foregoing, we affirm the Court of Appeals' holding that the Medical Amnesty Statute is inapplicable to Wilson's case. We likewise affirm the Court of Appeals' holding that the Medical Amnesty Statute is inapplicable to Milner's case, and remand in that case for further proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANTS, LINDSEY WILSON AND CRAIG MILNER:

Stephen Nathan Goens
Department of Public Advocacy

COUNSEL FOR APPELLEE, COMMONWEALTH OF KENTUCKY

Daniel J. Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General of Kentucky