RENDERED: MARCH 14, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0284-WC

LEWIS HICKS APPELLANT

ON APPEAL FROM COURT OF APPEALS
V. NO. 2022-CA-1392
WORKERS' COMPENSATION BOARD NOS. WC-20-01293,
WC-20-01296, WC-20-01373, & WC-20-01449

KENTUCKY EMPLOYERS' MUTUAL APPELLEES
INSURANCE COMPANY;
SOUTHEASTERN LAND LLC; THOMAS
POLITES, ADMINISTRATIVE LAW
JUDGE; UNINSURED EMPLOYERS'
FUND; AND WORKERS'
COMPENSATION BOARD

**OPINION OF THE COURT BY JUSTICE NICKELL**

**AFFIRMING**

Lewis Hicks has appealed from the decision of the Court of Appeals

which reversed a decision of the Workers' Compensation Board ("Board")

affirming an Administrative Law Judge's ("ALJ") Opinion and Order which

awarded KRS Chapter 342 medical and disability benefits after determining

Kentucky had extraterritorial jurisdiction over Hicks' workers' compensation

claim. Hicks argues the ALJ and Board correctly determined Kentucky has

extraterritorial jurisdiction over this workers' compensation claim under KRS[1]

---

[1] Kentucky Revised Statutes.

342.670 and the Court of Appeals erred in concluding to the contrary. After a careful review, we disagree, and affirm the Court of Appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Hicks worked in Kentucky as a foreman for Eagle Coal, a subsidiary of Booth Energy, from 1996 until 2017, a period of about twenty-one years. In August 2017, Booth Energy's HR director, CEO, and one of its owners, asked Hicks to transfer his employment to another of Booth Energy's subsidiaries, Southeastern Land, LLC, to work as a section foreman at that company's "Alma" Mine location in Williamson, West Virginia. Southeastern Land was headquartered in Debord, Kentucky, approximately a 45-minute drive from the Alma Mine. Hicks agreed, transferred his employment from Eagle Coal to Southeastern Land, and began working as an onsite foreman at the Alma Mine where he remained until January 10, 2019—the date of his work-related injury.

During that seventeen-month period, Hicks worked six days and sixty hours per week in West Virginia, although he remained a resident of Kentucky. He obtained a valid West Virginia mine certification card, performed pre- and post-shift inspections as an underground foreman, and escorted and interacted with federal and West Virginia mine inspectors. In addition, he prepared paperwork from an office in a converted double-wide trailer on the mine premises provided by Southeastern Land for that purpose.

While working as a full-time foreman at the Alma Mine, Hicks would occasionally travel to Southeastern Land's headquarters in Kentucky to drop

2

off and pick up equipment, meet with the human resources supervisor and other members of management, and visit the mine supply store and safety office to return or obtain items for use at the Alma Mine. As a member of Southeastern Land's mine rescue team, he would also attend quarterly training sessions in Kentucky and visit the company's other mining facilities for training and "familiarization" with the mines. Although he believed his tenure in West Virginia was to be temporary, he was never offered reemployment in Kentucky.

On the date of his injury, Hicks was in the Alma Mine when he noticed a miner cable hung across a belt line. While he was attempting to remove the cable, a splice in the conveyor belt caught his jacket and pulled him down the belt line, causing injuries to his right shoulder and neck. He did not return to work following the injury.

Hicks received medical and income benefits from Southeastern Land's West Virginia workers' compensation insurance carrier.[2] Notwithstanding, on September 23, 2020, Hicks filed a workers' compensation claim in Kentucky alleging acute right shoulder and neck injuries with a claim for psychological overlay, cumulative trauma injuries to his back and bilateral shoulders, cumulative hearing loss, and coal workers' pneumoconiosis ("CWP").

---

[2] In addition to medical benefits, Hicks received temporary total disability (TTD) benefits of $823.14 per week from January 11, 2019, through September 3, 2020, and a permanent partial disability (PPD) award based on an 8% whole person impairment rating in the amount of $18,438.40.

Southeastern Land and its Kentucky insurance carrier, Kentucky Employers' Mutual Insurance Company ("KEMI"), argued Hicks' claim should be dismissed for lack of jurisdiction because the accident which resulted in his injuries occurred in West Virginia and Kentucky's extraterritorial coverage statute—KRS 342.670—could not operate to save the claim. Following briefing and a hearing, the ALJ issued an order concluding KRS 342.670(1)(a) was applicable based on his conclusion that Hicks' employment was "principally localized" in Kentucky at the time of his West Virginia injuries, thereby conferring jurisdiction in Kentucky for his claims. Based on this holding, the ALJ awarded Hicks TTD benefits, PPD benefits, and medical benefits for his back and shoulder injuries, while only medical benefits were awarded for his hearing loss. Hicks' CWP claim was dismissed.

Southeastern Land's subsequent petition for reconsideration was denied and KEMI appealed the ALJ's decision to the Board. In affirming, the Board concluded the evidence did "not compel a different result." KEMI then appealed to the Court of Appeals which reversed and remanded upon concluding the ALJ and Board had misconstrued KRS 342.670, having erred in holding Hicks' employment was "principally localized" in Kentucky rather than West Virginia. This appeal followed.

## II. STANDARD OF REVIEW

The Court of Appeals conducts a review of the Board with the purpose of "[correcting] the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an

4

error in assessing the evidence so flagrant as to cause gross injustice." *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). Further review by this Court of the decisions of the Court of Appeals and the Board is meant "to address new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude." *Id.* at 688.

As to questions of fact, "the ALJ, not this court and not the Board, has sole discretion to determine the quality, character, and substance of the evidence." *Abbott Laboratories v. Smith*, 205 S.W.3d 249, 253 (Ky. App. 2006). However, "we are bound neither by an ALJ's decisions on questions of law or an ALJ's interpretation and application of the law to the facts. In either case, our standard of review is *de novo*." *Bowerman v. Black Equip. Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009).

More particularly, "[t]he question of jurisdiction is ordinarily one of law, meaning that the standard of review to be applied is *de novo*." *Appalachian Reg'l Healthcare, Inc. v. Coleman*, 239 S.W.3d 49, 54 (Ky. 2007). While KRS 342.670 is titled "Extraterritorial coverage," Kentucky appellate decisions have historically used the terms "extraterritorial *jurisdiction*" and "extraterritorial *coverage*" interchangeably in relation to KRS 342.670, and this Court has expressly stated "KRS 342.670(1) provides that Kentucky can, under certain limited circumstances, exercise *jurisdiction* over injuries suffered in other states." *Consol of Kentucky, Inc. v. Goodgame*, 479 S.W.3d 78, 84 (Ky. 2015) (emphasis added).

5

### III.    STATUTORY CONSTRUCTION

As a matter of law, we review issues relative to statutory construction de novo.  Thus, on appeal, we owe no deference to the construction of statutes by the trial court or Court of Appeals.  *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.,* 238 S.W.3d 644, 647 (Ky. 2007).

The primary objective in construing statutory language is determining the intent of the Legislature in enacting the legislation.  To do so, "we look first to the language of the statute, giving the words their plain and ordinary meaning."  *Richardson v. Louisville/Jefferson Cnty. Metro Gov't,* 260 S.W.3d 777, 779 (Ky. 2008).  Statutes are to be construed as they are written, and "the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous[.]"  *W. Ky. Coal Co. v. Nall & Bailey,* 228 Ky. 76, 14 S.W.2d 400, 401-02 (1929).

If the statutory language is unambiguous, extrinsic evidence of legislative intent and public policy need not be considered.  *Cnty. Bd. of Educ. of Jefferson Cnty. v. Southern Pac. Co.,* 225 Ky. 621, 9 S.W.2d 984, 986 (1928).  Conversely, if an ambiguity exists, we may resort to examining legislative history and public policy considerations to determine the true intent of the statute.  *MPM Financial Group Inc. v. Morton,* 289 S.W.3d 193, 198 (Ky. 2009).  Otherwise, statutes are to be "read . . . as a whole, and with other parts of the law of the Commonwealth, to ensure that our interpretation is logical in context."  *Lichtenstein v. Barbanel,* 322 S.W.3d 27, 35 (Ky. 2010).  Utilizing these principles, we turn to an analysis of the language contained in KRS 342.670.

6

# IV. ANALYSIS

As in the Court of Appeals, the sole issue to be decided is whether KRS 342.670 authorizes KRS Chapter 342 medical and income benefits for injuries Hicks sustained while working under a Kentucky employment contract as a foreman for Southeastern Land at its West Virginia mining facility. Generally, the statute was enacted to extend such benefits to employees suffering out-of-state work-related injuries which would have otherwise been available under KRS Chapter 342 had the injuries occurred within Kentucky, but only in certain limited circumstances. In relevant part,[3] KRS 342.670(1) provides:

> (1) If an employee, while working outside the territorial limits of this state, suffers an injury on account of which the employee . . . would have been entitled to the benefits provided by this chapter had that injury occurred within this state, that employee . . . shall be entitled to the benefits provided by this chapter, if at the time of the injury:
>
> (a) His or her employment is principally localized in this state; or
>
> (b) He or she is working under a contract of hire made in this state in employment not principally localized in any state; . . . .

Thus, the dispositive issue in the present appeal concerns whether Hicks' employment *was* "principally localized" in Kentucky, thereby sanctioning KRS Chapter 342 coverage under KRS 342.670(1)(a), or whether his employment

---

[3] Under the present facts, KRS 342.670(1)(c) cannot authorize KRS Chapter 342 extraterritorial coverage because—though he was hired under a Kentucky employment contract and even if his employment were deemed "principally localized" in West Virginia—that state's workers' compensation laws were applied to provide medical and income benefits covering Hicks' work-related injuries. Further, KRS 342.670(1)(d) cannot authorize KRS Chapter 342 coverage because—even though Hicks was hired under a Kentucky employment contract—his position did not entail work "outside the United States or Canada."

7

*was not* "principally localized" in Kentucky but rather another state, including West Virginia, whose workers' compensation law is applicable, under KRS 342.670(1)(b), thereby disallowing KRS Chapter 342 coverage.

KRS 342.670(5)(d) provides the statutory definition to be applied to the term, "principally localized," stating:

> A person's employment is principally localized in this **or** another state when:
>
> 1. His or her employer has a place of business in this **or** the other state and he regularly works at or from that place of business, or
>
> 2. If subparagraph 1. foregoing is not applicable, he or she is domiciled and spends a substantial part of his or her working time in the service of his or her employer in this **or** the other state[.]

(Emphasis added).[4] Thus, when determining if employment is "principally localized" within a particular state, KRS 342.670(5)(d) directs an ALJ to first discern whether the employer has a regular place of business in the state, and if so, to then establish whether the employee regularly works at or from that place of business. *Haney v. Butler,* 990 S.W.2d 611, 616 (Ky. 1999). If the

---

[4] Notably, the General Assembly incorporated the disjunctive "or" multiple times in crafting KRS 342.670(5)(d). As we have previously held "[i]n common and natural usage the word 'or' is disjunctive and expresses an alternative as between either of two or more separate subjects or conditions and implies an election or choice as between them." *Cabinet for Health and Fam. Servs. on behalf of C.R. v. C.B.*, 556 S.W.3d 568, 572 (Ky. 2018) (citations omitted). Applying this legal precedent, it is clear the General Assembly plainly intended that only *one* state—if any—can qualify as an employee's "principal" employment location. This construction is wholly consistent with the legal understanding of the term, "principal," which has been defined to mean "[c]hief; primary; or most important," thereby suggesting a singular and preeminent character. *Principal, Black's Law Dictionary*, 1443 (Rev. 11th ed. 2019).

answer to each inquiry is in the affirmative, then the employee's employment must be deemed to be "principally localized" in the subject state, and no further analysis is warranted. *Id.* The resulting employment characterization must be appropriately applied under the provisions contained in KRS 342.670(1).

The parties agree Hicks was injured while working in West Virginia. Further, it is undisputed that Hicks would have been entitled to KRS Chapter 342 benefits if his injury had occurred in Kentucky. Thus, Hicks plainly falls within the category of employees for whom KRS 342.670 potentially extends coverage. Therefore, the dispositive issue centers on where Hicks' employment was "principally localized."

Here, the ALJ determined Southeastern Land had a place of business at its headquarters in Debord, Kentucky, that Hicks regularly worked at or from that place of business, and that he had done so for twenty of the previous twenty-three years "until the temporary transfer or loan" to the West Virginia mine. The Board noted Hicks' past work in Kentucky was not determinative yet concluded Hicks' testimony regarding the temporary nature of his West Virginia employment to be compelling.

The Court of Appeals, citing *Amax Coal Co. v. Smith*, 748 S.W.2d 158, 160 (Ky. App. 1988), agreed with the Board that an employee's past work history is irrelevant because the inquiry under KRS 342.670(1) is limited to the employee's status "at the time of the injury." It disagreed with the remainder of the ALJ's and the Board's conclusions that KRS 342.670(1)(a) was applicable

9

and entitled Hicks to KRS Chapter 342 benefits.  Our review confirms the analysis and conclusion of the Court of Appeals was correct.

First, as relates to Kentucky workers' compensation claims, the term "regular" has been defined to mean "customary, usual or normal."  *General Elec. Co. v. Cain,* 236 S.W.3d 579, 586 (Ky. 2007) (citing *Webster's New College Dictionary,* 928 (1995)).  Legal lexicons have similarly defined "regular" to mean "[s]teady or uniform in course, practice or occurrence; not subject to unexplained or irrational variation" and "[u]sual, customary or general." *Regular, Black's Law Dictionary,* 1155 (Rev. 5th ed. 1979).

Second, this Court has previously clarified the two-pronged requirements enacted in the foregoing statutory definition of "principally localized," holding:

> for an employment to be principally localized within a particular state for the purposes of KRS 342.670(4)(d)1., the employer must either lease or own a location in the state at which it regularly conducts its business affairs, and the subject employee must regularly work at or from that location.

*Haney,* 990 S.W.2d at 617.  Thus, to meet the first prong of the definition, it must be shown an employer not only leased or owned a "place of business" within a state, the employer must have also "regularly" conducted its business affairs from that location.  For this reason and applying the plain and ordinary meaning of "regular," an employer's place of business under KRS 342.670(5)(d)1. is any leased or owned location at which its customary, usual, and normal business-related activities are generally, typically, and routinely carried out in a steady, stable, and consistent course.

10

Hicks argues Southeastern Land did not have a principal place of business in West Virginia, thereby making it impossible for his employment to be considered "principally localized" in that state under the first prong of KRS 342.670(5)(d)1. As an initial matter, the statutory scheme does not require an employer to have a "principal" place of business in a state, but merely a "place of business." The location of Southeastern Land's headquarters is immaterial to the calculus. Further, Hicks' assertion that Southeastern Land did not operate a place of business in West Virginia is contrary to the evidence. Hicks himself testified Southeastern Land's Alma Mine was an active mine site and admitted the company maintained structures on the site for equipment and materials storage along with two mobile office trailers—one of which served as his personal space for completion of paperwork. In support of his assertion that his position was merely temporary, Hicks makes much of the office trailers being "mobile" structures. However, Hicks' point is immaterial because our inquiry focuses on whether the employer owns or leases a location with a state rather than on the permanency of a particular location or structure. *Haney*, 990 S.W.2d at 617.

Here, the record establishes Southeastern Land owned or leased locations in both Kentucky and West Virginia at which it "regularly" conducted business affairs related to its mining operations, whether at its headquarters or its active mine sites. For these reasons, Southeastern Land clearly maintained "a place of business" in each state pursuant to KRS 342.670(5)(d)1.

11

Third, under the foregoing statutory definition of "principally localized" employment, it must next be determined whether the employee "regularly" worked at or from the employer's place of business located within a state. Hicks argues he did not regularly work in West Virginia because he spent the vast majority of his working years in Kentucky; his assignment to West Virginia was merely "temporary;" he only paid Kentucky state income taxes;[5] his domicile remained in Kentucky throughout his employment; and he completed substantial amounts of work in Kentucky. We disagree.

Again, applying the plain and ordinary meaning to terms used in the second prong of KRS 342.670(5)(d)1., an employee "regularly works" at or from an employer's place of business where he or she usually, ordinarily, generally, or routinely performs his or her usual, customary, chief, or primary employment duties, as opposed to locations where he or she may occasionally, sporadically, or intermittently perform special, ancillary, subsidiary, or subordinate employment duties. Generally, evidence that an employee spent a significant portion or majority of his or her work time at an employer's particular place of business within a state impact the inquiry, if not prove dispositive. *Haney*, 990 S.W.2d at 617-18.[6]

---

[5] We note, however, Kentucky and West Virginia entered into a reciprocal income tax agreement on April 9, 1965, whereby employees who reside wholly in one state but earn wages or salaries in the other are taxed by their state of residence, and not the state where the income is earned. *See* 103 KAR 17:140. Thus, because Hicks remained a Kentucky resident throughout the period he was working at the Alma Mine, his income was only subject to taxation by the Kentucky Department of Revenue and not by the West Virginia Tax Division.

[6] In *Haney*, the employer maintained corporate headquarters in Paducah, Kentucky, and was involved in the business of hauling cargo over inland waterways

In *Eck Miller Trans. Corp. v. Wagers*, 833 S.W.2d 854 (Ky. App. 1992), the Court of Appeals dealt with a factually analogous situation to the present appeal. Wagers was a truck driver who resided in Kentucky and worked for a company which did business in Kentucky and Tennessee. *Id.* at 855. For approximately eighteen months, he was assigned to his employers' Chattanooga, Tennessee, terminal, where he received most of his work orders. *Id.* However, he performed a "substantial" amount of work from his home, including preparing paperwork and performing vehicle maintenance tasks. *Id.* During that time, Wagers sustained a work-related injury and did not return to work*. Id.* An ALJ concluded Kentucky did not have extraterritorial jurisdiction over Wagers' claim. The Board reversed, but the Court of Appeals disagreed, stating that

> [u]pon our review of the record, we must hold that the ALJ's findings were consonant with the evidence presented to him. It is indisputably the case that Miller assigned Wagers to work from Miller's place of business in Chattanooga, Tennessee, for the one and one-half years prior to his accident. Wagers received

stretching across Kentucky, Alabama, Mississippi, Tennessee, and Louisiana. The employee maintained an office at the Kentucky headquarter facilities but resided near Nashville, Tennessee. As a "troubleshooter," he traveled extensively, but there was no evidence concerning what portion of his work time was spent in each state. He was killed in a motor vehicle accident in Alabama while returning to his Tennessee home after attending to the employer's business affairs in Alabama. Though the employee spent significant work time in Alabama at various ports, the employer did not lease or own any property, nor did it maintain a business office in the state. We held the evidence was insufficient to establish an Alabama place of business. We similarly held the evidence was insufficient to establish the employee "spent a 'substantial part' of his working time" in his employer's service in Tennessee. Because it was undisputed that employment was not principally localized in Kentucky, and because the evidence was insufficient to establish employment was principally located in Alabama, Tennessee, or any other state, we concluded Kentucky had jurisdiction over the claim pursuant to KRS 342.670(1)(b), due to his having been hired under a Kentucky employment contract.

13

substantially all his work orders from Chattanooga, and was in fact in Tennessee when the accident in question occurred. Under these circumstances, the ALJ's finding under KRS 342.670(1)(a) as defined by (4)(d)(1) [now KRS 342.670(5)(d)1[7]] that Wagers worked "from" Tennessee for statutory purposes is certainly supported by "reliable, probative, and material evidence." KRS 342.285(2)(d).

Here, like the truck driver in *Wagers*, Hicks was required to perform some work-related tasks in Kentucky. However, as correctly noted by the Court of Appeals, none of those tasks could be deemed more "substantial" than the work performed by Wagers. Notably, the injuries incurred in the present case and in *Wagers* each occurred outside of Kentucky after both employees had regularly worked for a significant period in a neighboring state. Thus, the logic and holding of *Wagers* apply with equal force to the present circumstances.

Here, Southeastern Land conducted ongoing business-related activities at its West Virginia mining facility where Hicks worked six days and sixty hours per week while regularly and steadily performing his chief duties as an onsite underground section foreman. He only occasionally traveled to the company's Kentucky headquarters or other mining locations to perform ancillary, subsidiary, secondary, or special administrative or mining duties. He had been employed as a foreman at the Alma Mine for seventeen months when he sustained his injuries while performing his duties at the facility. Certainly, the vast majority of his work time was devoted to his employment

---

[7] In 1996, the Kentucky legislature amended KRS 342.670, resulting in a renumbering of this section. *See* 1996 Ky. Laws ch. 355 (S.B. 161) (eff. Jul. 15, 1996).

responsibilities at the West Virginia jobsite. For these reasons, Hicks "regularly" worked at or from Southeastern Land's regular "place of business" in West Virginia pursuant to KRS 342.670(5)(d)1.

Based on the foregoing, and pursuant to KRS 342.670(1), we hold Hicks' employment was "principally localized" in West Virginia. As a result, we further hold Hicks does not qualify for KRS Chapter 342 benefits under KRS 342.670(1)(a) because his employment *was not* principally localized in Kentucky, nor does he qualify under KRS 342.670(1)(b) because though working under a Kentucky employment contract his employment *was* principally localized in another state.

Accordingly, the decision of the Court of Appeals is affirmed.

VanMeter, C.J.; Bisig, Conley, Keller, Nickell and Thompson, JJ., sitting. VanMeter, C.J.; Bisig and Conley, JJ., concur. Keller, J., dissents by separate opinion in which Thompson, J., joins. Lambert, J., not sitting.

KELLER, J., DISSENTING: According to the record, Lewis Hicks is a 53-year-old lifelong Kentuckian and coal miner who worked for a single corporation or its subsidiaries for over two decades. He possesses a high school degree and numerous mining certificates. While working at his employer's West Virginia mine in January 2019, Hicks attempted to remove a mining cable from a conveyer belt line when a splice in the conveyer belt caught his jacket and pulled him down the conveyer belt. He sustained significant injuries to his right shoulder and neck. Hicks received approximately $92,000 in total workers' compensation income benefits from Southeastern's West Virginia

15

workers' compensation insurance carrier. A Kentucky Administrative Law Judge (ALJ) awarded Hicks approximately $275,000 in workers' compensation income benefits (plus interest) to be reduced by the award he had already received in West Virginia—meaning that Hicks would additionally receive over $180,000 in income benefits for his injury in the Commonwealth of Kentucky under KRS Chapter 342, our Workers' Compensation Act. The Workers' Compensation Board (Board) affirmed the ALJ's award. Today, the Majority has affirmed the Court of Appeals, which reversed the ALJ and the Board, and, in doing so, has stripped Hicks of his Kentucky workers' compensation award. Because I would hold that the ALJ's **factual determination** that Hicks regularly worked **at or from** Kentucky is both supported by substantial evidence and entitled to this Court's deference, I would affirm the ALJ's award of workers' compensation benefits to Hicks.

### A. Standard of Review

Our standards of review in workers' compensation cases have been firmly established for decades. It is the ALJ, not this Court, that has the sole discretion to determine the quality, character, and substance of the evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). On appellate review, the ALJ's findings of fact are entitled to considerable deference. *U.S. Bank Home Mortg. v. Schrecker*, 455 S.W.3d 382, 384 (Ky. 2014) (citing *Bullock v. Peabody Coal Co.*, 882 S.W.2d 676 (Ky. 1994)). By the time a workers' compensation appeal reaches this Court, "our review is generally limited to the determination of 'new or novel questions of statutory

16

construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude.'" *Lexington Fayette Urban Cnty. Gov't v. Gosper*, 671 S.W.3d 184, 200 (Ky. 2023) (quoting *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 688 (Ky. 1992)). Simply, we will not second-guess the decisions of the ALJ, Board, or Court of Appeals upon the same evidence. *Id.* at 200. Accordingly, we will only reverse the ALJ's decision where the "ALJ overlooked or misconstrued controlling law or so flagrantly erred in evaluating the evidence that it has caused gross injustice." *Schrecker*, 455 S.W.3d at 384 (citing *W. Baptist Hosp.*, 827 S.W.2d at 687–88).

### B. Analysis

Whether Hicks is entitled to Kentucky workers' compensation benefits, as a matter of law, hinges on whether his injury is covered under our Commonwealth's "extraterritorial coverage" statute which prescribes certain factual circumstances in which an employee who is injured outside of Kentucky "shall be entitled to the benefits." KRS 342.670(1). Hicks is "covered" under KRS 342.670, in this case, if his employment was "principally localized" in Kentucky under KRS 342.670(1)(a), which is, in turn, predicated on a necessary **factual finding** that he "regularly works at or from" Southeastern's place of business in Kentucky.

This Court is not in the business of relitigating or reweighing the facts of each workers' compensation case that comes before it; we will not substitute our judgment for that of the ALJ. However, that is exactly what the Majority does in the case before us today. Rather than afford the ALJ's factual findings

17

their due deference in this case, the Majority couches its analysis as a purely de novo review of the ALJ's "jurisdiction" determination. This is the wrong standard of review against which to examine this case. Although often couched as a question of extraterritorial "jurisdiction," the plain language of KRS 342.670 itself makes no mention of jurisdiction, as it is titled "Extraterritorial coverage," and merely states circumstances under which an employee who is injured outside of Kentucky "shall be entitled to the benefits provided by [the workers' compensation] chapter." KRS 342.670(5)(d)(1).

Kentucky's courts have often treated the factual preconditions necessary to establishing extraterritorial coverage as just that: facts. Accordingly, our appellate courts have not disturbed the ALJ's determination of those facts where they were supported by substantial evidence. *See, e.g., Ky. Emps.' Mut. Ins. v. Burnett*, 432 S.W.3d 733, 738–39 (Ky. App. 2014) (substantial evidence supported the ALJ's determinations that Appellee's contract of hire was entered into in Kentucky and his employment was not principally localized in any state); *Eck Miller Transp. Corp. v. Wagers*, 833 S.W.2d 854, 855 (Ky. App. 1992) (substantial evidence supported the ALJ's determination that Appellee worked "from" employer's place of business in Tennessee, therefore his employment was principally localized in Tennessee); *Graham v. TSL, Ltd.*, 350 S.W.3d 430, 432-33 (Ky. 2011) (substantial evidence supported the ALJ's determinations that Appellant's contract of hire was made in Missouri and his employment was not principally localized in any state); *Dallas Nat. Ins. Co. v. Board*, No. 2012-SC-000288-WC, 2013 WL 3155846, *2 (Ky. June 20, 2013) (substantial

18

evidence supported the ALJ's determination that Appellee regularly worked at or from employer's place of business in Kentucky, therefore his employment was principally localized in Kentucky).

Here, the ALJ determined, as a matter of fact, that "[Southeastern] has a place of business in Kentucky . . . and [Hicks] regularly works at or from that place of business . . . ." As support for that finding, the ALJ noted an abundance of substantial evidence which is necessary to recount.

The ALJ found that Hicks worked for Southeastern (or its predecessor) for 23 years and worked full time in Kentucky for Southeastern for approximately 20 of those years. The ALJ further found that Southeastern asked Hicks to **temporarily** transfer to its mine in West Virginia in 2017 to assist in developing a new mining technique. Hicks testified that he was chosen for this assignment because of his expertise and skills pertaining to ventilation techniques and his experience as a mine superintendent. The ALJ found that Hicks was "loaned" to the West Virginia mine "with the understanding that he would return to Kentucky to work."

The ALJ noted that even after he began working in the West Virginia mine, Hicks "remained in constant contact with his mines in Kentucky in regard to equipment, inspections, and dust reports." The ALJ further noted that Hicks would receive phone calls and text messages from the workers at the Kentucky mines "when he was in Kentucky and at home, all hours of the night." The ALJ also stated that Hicks "would occasionally visit the [Kentucky] office to drop off equipment, discuss payroll issues, pick up parts that he could

19

haul in his vehicle to take to West Virginia, and turn in safety equipment that needed replacement or calibration." Hicks would also go to the Kentucky office to meet with supervisors "to receive instructions regarding mining issues and execution of mine plans in regard to mines in Kentucky and West Virginia."

The ALJ further stated that Hicks "would still work in Kentucky in regard to mine safety practices and he would go back and forth." Hicks conducted "mine rescue visits at mines in Perry and Pike counties which were **quarterly** visits and he trained in Kentucky at the Defendant's mine rescue training facility which was in Kentucky." (Emphasis added). The ALJ further specifically stated that Hicks "returned to Kentucky **regularly** to train at the Defendant's mine rescue facility in Warfield, Kentucky, and he entered underground mines on a **regular** basis in Pike and Perry counties to train and be familiar with the mines." (Emphasis added).

My review of the record and the ALJ's detailed opinion convince me that the ALJ's finding that Hicks "regularly worked at or from" Southeastern's place of business in Kentucky was supported by substantial evidence, and thus entitled to this Court's deference. I note that my conclusion is also shared by the Board, which upheld the ALJ's determination on this matter and stated that "substantial evidence supports the ALJ's finding that jurisdiction extended to Kentucky pursuant to KRS 342.670(1)(a)." The Board further stated, "The ALJ found Hicks' testimony that he was a loaned employee to the Alma mine in West Virginia on a temporary basis was credible and never rebutted. The ALJ found Hicks was hired in Kentucky, was paid in Kentucky, and he continued to

20

have contacts with the main office in . . . Kentucky on a regular basis. Certainly, his work in West Virginia was not exclusive."

I am further unconvinced, and unwilling to hold, that the specific facts of this case are somehow insufficient as a matter of law to preclude an award of benefits or that the language of KRS 342.670 precludes an award of benefits. While this Court does not owe any deference to the ALJ's application of the facts of this case to our existing law, nor its interpretation of our extraterritorial coverage statute, the Majority's analysis does not adequately explain which portions of the law the ALJ misconstrued in reaching its determination—only that the Majority would reach a different determination based on the facts of this case. Such an analysis is not one grounded in interpretation of the statute, but rather in a reweighing of the evidence.

Simply, I would hold that the ALJ did not "misconstrue" any controlling law in concluding that Hicks was entitled to workers' compensation benefits under KRS 342.670(1)(a). Until today, this Court had never thoughtfully considered exactly what the legislature meant when it wrote "regularly works at or from," perhaps because of the inherent simplicity of these words. I am of the opinion that the Majority's reversal of the ALJ's award today strips those words of the simplicity the legislature intended and assigns to them a legal meaning that hampers the discretion of our ALJs. In short, I do not believe that the ALJ misconstrued the words "regularly works at or from" as the legislature wrote them.

KRS 342.670(1)(a) provides for workers' compensation coverage under the laws of Kentucky when an employee is injured in another state if his "employment is principally localized in this state." We next look to KRS 342.670(5)(d)(1), which provides that "[a] person's employment is principally localized in this or another state when . . . [h]is . . . employer has a place of business in this or the other state and he . . . regularly works **at** or **from** that place of business." (Emphasis added). When we construe statutes, "our goal . . . is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011) (citing *Osborne v. Commonwealth*, 185 S.W.3d 645 (Ky. 2006)). We are to "lend words of a statute their normal, ordinary, everyday meaning." *Adams v. Commonwealth*, 599 S.W.3d 752, 754 (Ky. 2019) (quoting *Stephenson v. Woodward*, 182 S.W.3d 162, 170 (Ky. 2005)). Further, "we assume that the '[Legislature] meant exactly what it said, and said exactly what it meant.'" *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005) (alteration in original) (quoting *Stone v. Pryor*, 103 Ky. 645, 45 S.W. 1136, 1142 (1898) (Waddle, S.J., dissenting)). We also presume that the General Assembly intended for all of a statute's parts to have meaning. *Shawnee Telecom*, 354 S.W.3d at 551.

I find it noteworthy that the plain language of the statute includes no requirement of comparative analysis—meaning it does not require that a

22

person work at or from one state (Kentucky) more often than another (West Virginia), in order for his employment to be principally localized there (Kentucky). Neither does the statute prohibit the ALJ from considering the "temporary" nature of an employee's work location at the time of injury. Nor does it preclude the ALJ from considering an employee's entire work history with his employer. The statute simply requires that the employee "regularly works at or from" a place of business in Kentucky at the time of his injury.

As the Majority points out, this Court has previously employed the words "customary, usual or normal" to define the meaning of the word "regular" in some workers' compensation contexts. *Gen. Elec. Co. v. Cain,* 236 S.W.3d 579, 586 (Ky. 2007) (citing *Webster's New College Dictionary*, 934 (1995)). However, I assert that the use of the word "regular" in the phrase "regularly works" in KRS 342.670 refers only to **regularity of time** spent at the place of business as opposed to **regularity of task** performed at the place of business, as is held by the Majority. In order for an employee to "regularly work" at or from a certain place of business, he must "usually, ordinarily, generally, or routinely perform[] his or her" work duties there. There is nothing in the statute, however, that requires that the duties performed at that location must also be "usual, customary, chief, or primary." Such a requirement would further frustrate the portion of the statute that extends coverage to employees who regularly work **from** Kentucky.

I further posit to the Majority that a determination of what is usual, ordinary, or routine necessarily involves a consideration of past practices and

23

temporality—exactly the considerations most persuasive to the ALJ in the case before us today. The Majority's interpretation of KRS 342.670 minimizes, if not erases, those considerations from the ALJ's review; surely this cannot be what the legislature meant when it used the word "regularly." I am of the opinion that the legislature did not intend to exclude from workers' compensation coverage those long-term Kentucky employees, like Hicks, who devote substantial portions of their careers to one Kentucky company and are merely temporarily transferred out of state for the benefit of their Kentucky employer.

I am further unwilling to say that the transient nature of Hicks's employment—his travel "back and forth" from Kentucky and West Virginia—somehow disqualifies him from coverage under KRS 342.670. It appears to have been overlooked that our extraterritorial coverage statute clearly seeks to extend coverage to those workers who work "at **or** from" a place of business in Kentucky. (Emphasis added). The presence of the disjunctive "or" indicates those two words which it separates are to be given separate meanings. *MGG Inv. Group LP v. Bemak N.V., Ltd.*, 671 S.W.3d 76, 85 (Ky. 2023).

The plain language of this provision benefits those workers, like Hicks, that cross state lines for work, but maintain a regular or fixed place of employment in Kentucky **from** which they are dispatched. *See, e.g., Wagers*, 833 S.W.2d 854; *Dallas Nat. Ins. Co.,* 2013 WL 3155846; *Gaddis v. Lone Star Transp.,* No. 2009-CA-001173-WC, 2010 WL 2010871 (Ky. App. May 21, 2010). Our extraterritorial coverage statute is perhaps most important to those workers who work **from** Kentucky, because it is those workers who assume the

24

greatest odds they will be injured outside of the Commonwealth, and therefore it is for the benefit of those workers that the statute exists at all.

Although the Majority relies heavily on the analysis conducted by the Court of Appeals in *Eck Miller Transportation Corp. v. Wagers*, 833 S.W.2d 854, this Court has only reviewed the application of this crucial portion of the extraterritorial coverage statute once. In that case, we affirmed an ALJ's finding that a Kentucky worker who regularly picked up a truck from his employer's place of business in Kentucky, received goods to be shipped, drove those goods out of state, and was then injured in North Carolina did work "from" Kentucky for purposes of extraterritorial coverage. *Dallas Nat. Ins. Co.*, 2013 WL 3155846, at *2. I see no reason why the logic of this holding cannot be applied to those Kentucky workers, like Hicks, who similarly engage in frequent travel across state lines in service to their employer.

I reemphasize the ALJ's findings that Hicks would "visit the [Kentucky] office to drop off equipment, discuss payroll issues, pick up parts that he could haul in his vehicle to take to West Virginia," and that he would "receive instructions [at the Kentucky office] regarding mining issues and execution of mine plans in regard to mines in Kentucky and West Virginia." These facts certainly support a finding that Hicks worked from Southeastern's place of business in Kentucky. Dropping off and picking up equipment, along with receiving instructions and mine plans from a central office, are analogous to those employment tasks completed by the worker in *Dallas National Insurance Co.* who we held did, in fact, work **from** Kentucky.

25

In sum, there is nothing in the plain language of KRS 342.670 that precludes the ALJ's award of benefits to Hicks in the case before us today, nor did the ALJ weigh the facts of this case against an incorrect legal standard. In interpreting this statute, I further embrace the principle that this Court should liberally construe our Workers' Compensation Act "in favor of the employee in order to effectuate the beneficent purposes of the" Act. *Lewallen v. Peabody Coal Co.*, 306 S.W.2d 262, 264 (Ky. 1957) (citing *Bartley v. Bartley*, 274 S.W.2d 48, 49 (Ky. 1954)). The legislature's use of the entire phrase "regularly works at or from" indicates an intention to broadly apply its extraterritorial coverage statute. The phrase shows an intent for extraterritorial coverage to be comprehensive and inclusive. The Majority applies this phrase narrowly, which is at odds with both the intent of the legislature and the beneficent purposes of the Act.

Simply, Hicks regularly worked at or from Southeastern's place of business in Kentucky for two decades and was asked to temporarily relocate to Southeastern's West Virginia location with the promise that he would soon return to working in Kentucky full-time. Hicks obliged and began a 17-month stint in West Virginia, during which he continued to work **at or from** Southeastern's Kentucky places of business on a **regular** basis. Hicks was then injured at Southeastern's place of business in West Virginia. For purposes of workers' compensation coverage under KRS 342.670, I cannot say that Hicks did not "regularly work at or from" Kentucky at the time of his injury as a

26

matter of law. Nor can I say that the ALJ's factual determination that Hicks "regularly worked at or from" Kentucky was not based on substantial evidence.

Accordingly, I would affirm the ALJ's award of benefits to Hicks.

Thompson, J., joins.

COUNSEL FOR APPELLANT:

McKinnley Morgan
W. Gerald Vanover, Jr.
Morgan Collins Yeast & Salyer


COUNSEL FOR APPELLEE, KEMI:

Johanna Frantz Ellison
Taylor L. Oldham
Fowler Bell PLLC


COUNSEL FOR APPELLEE, SOUTHEASTERN LAND LLC:

Brandon L. Rosen
POHL, AUBREY, GRAY P.S.C.


COUNSEL FOR APPELLEE, UNINSURED EMPLOYERS' FUND:

James R. Carpenter
Assistant Attorney General


WORKERS' COMPENSATION BOARD:

Hon. Michael Wayne Alvey
Chairman